# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| TOM HIGGINS, individually and on behalf of the settlement class, | Case No.: 2:15-cv-13769 |
| Plaintiff, | Hon. Stephen J. Murphy, III |
| v. | Mag. Mona K. Majzoub |
| TV GUIDE MAGAZINE, LLC, a Delaware limited liability company, |  |
| Defendant. |  |

## PLAINTIFF'S MOTION FOR AND BRIEF IN SUPPORT OF ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

**Respectfully submitted by:**

Ari J. Scharg
ascharg@edelson.com
Schuyler R. Ufkes
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Eve-Lynn J. Rapp
erapp@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Henry M. Scharg
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: (248) 596-1111
Fax: (248) 671-0335

*Settlement Class Counsel*

## PLAINTIFF'S MOTION FOR
## ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

Plaintiff Tom Higgins hereby moves the Court to grant his Motion for Attorneys' Fees, Expenses, and Incentive Award. Specifically, Class Counsel respectfully requests that the Court grant $595,000—or 35% of the $1,700,000 non-reversionary Settlement Fund—in attorneys' fees and expenses and an incentive award of $5,000 for Plaintiff Tom Higgins. In accordance with Local Rule 7.1(a), Plaintiff conferred with counsel for Defendant TV Guide Magazine, LLC on November 9, 2018. Defendant will not oppose the relief sought by this Motion.

For the reasons discussed in the accompanying brief, the Motion should be granted.

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD**

**STATEMENT OF ISSUES PRESENTED**

1.      Whether this Court should award Class Counsel attorneys' fees and
expenses in the amount of $595,000—35% of the $1,700,000 non-reversionary
common fund created for the benefit of the Settlement Class—to compensate them
for achieving a substantial benefit for a class of consumers under Michigan's
Preservation of Personal Privacy Act, M.C.L. §§ 445.1711-1715, *et seq.*?

**Plaintiff's Answer: Yes.**

2.      Whether this Court should award Plaintiff Tom Higgins an incentive
award of $5,000 in recognition of his zealous efforts on behalf of the class,
including his willingness to step up as the class representative when the former
lead plaintiff could no longer serve due to a health issue?

**Plaintiff's Answer: Yes.**

## CONTROLLING AND MOST IMPORTANT AUTHORITY

### UNITED STATES SUPREME COURT CASES:

*Boeing Co. v. Van Gemert*,
     444 U.S. 472 (1980)

*Eisen v. Carlisle & Jacquelin*,
     417 U.S. 156 (1974)

### UNITED STATES COURT OF APPEALS CASES:

*Gascho v. Glob. Fitness Holdings, LLC*,
     No. 14-3761, 2016 WL 2802473 (6th Cir. May 13, 2016)

*Hadix v. Johnson*,
     322 F.3d 895 (6th Cir. 2003)

*In re Pampers Dry Max Litig.*,
     724 F.3d 713 (6th Cir. 2013)

*Isabel v. City of Memphis*,
     404 F.3d 404 (6th Cir. 2005)

*Ramey v. Cincinnati Enquirer, Inc.*,
     508 F.2d 1188 (6th Cir. 1974)

*Rawlings v. Prudential-Bache Props., Inc.*,
     9 F.3d 513 (6th Cir. 1993)

*Van Horn v. Nationwide Prop. & Cas. Ins. Co.*,
     436 F. App'x 496 (6th Cir. 2011)

### UNITED STATES DISTRICT COURT CASES:

*Coulter-Owens v. Rodale, Inc.*,
     No. 14-cv-12688 (E.D. Mich. Sep. 29, 2016)

*Halaburda v. Bauer Publ'g Co., LP*,
     No. 12-cv-12831 (E.D. Mich. 2013)

*In re Cardizem CD Antitrust Litig.*,
219 F.R.D. 508 (E.D. Mich. 2003)

*In re Delphi Corp. Sec., Derivative & ERISA Litig.*,
248 F.R.D. 483 (E.D. Mich. 2008)

*In re Rio Hair Naturalizer Prods. Liab. Litig.*,
1996 WL 780512 (E.D. Mich. Dec. 20, 1996)

*Kinder v. Meredith Corp.*,
No. 13-cv-11284 (E.D. Mich. May 18, 2016)

*Kogan v. AIMCO Fox, L.P.*,
193 F.R.D. 496 (E.D. Mich. 2000)

*Moeller v. Am. Media, Inc.*,
No. 5:16-cv-11367 (E.D. Mich. June 8, 2017)

*Perlin v. Time Inc.*,
No. 16-cv-10635, (E.D. Mich. Oct. 15, 2018)

**MISCELLANEOUS:**

Fed. R. Civ. P. 23

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................. 1

II.  FACTUAL BACKGROUND AND UNDERLYING LAW ..................... 3

    A.  Plaintiff's Allegations Under the PPPA ............................. 3

    B.  The Litigation and Work Performed to Benefit the Class ............ 5

    C.  The Terms of the Settlement Agreement ........................... 9

III.  THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND SHOULD BE APPROVED .............................................. 10

    A.  The Percentage Method Should Be Used to Calculate Fees ........ 11

    B.  The Reasonableness of the Requested Fees is Supported by This Circuit's Six-factor Test ...................................... 12

        1.  *Class Counsel have secured a valuable benefit for the class* ................................................... 14

        2.  *Society has a stake in incentivizing the pursuit of complex consumer privacy litigation* ..................... 20

        3.  *Class Counsel took the case on a contingent basis, confronting a significant risk of nonpayment* ............ 21

        4.  *The complexity of the litigation supports the requested fees* .................................................. 23

        5.  *The Parties are both represented by skilled counsel* ........ 24

        6.  *The value of the legal services performed on an hourly basis is reasonable* .......................................... 26

    C.  The Requested Incentive Award Reflects Mr. Higgins' Active Involvement in This Action and Should Be Approved ............... 29

IV.  CONCLUSION ................................................................. 32

# TABLE OF AUTHORITIES

## United States Supreme Court Cases

*Boeing Co. v. Van Gemert,*
    444 U.S. 472 (1980) ................................................................. 14

*Eisen v. Carlisle & Jacquelin,*
    417 U.S. 156 (1974) ................................................................. 20

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) ............................................................ 26, 27

*Perdue v. Kenny A. ex rel. Winn,*
    559 U.S. 542 (2010) ................................................................. 12

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016)................................................... 6, 7, 24, 25

## United States Appellate Court Cases

*Johnson v. Georgia Highway Express, Inc.,*
    488 F.2d 714 (5th Cir. 1974) ...................................................... 27

*Bowling v. Pfizer, Inc.,*
    102 F.3d 777 (6th Cir. 1996) ...................................................... 13

*Brian A. v. Hattaway,*
    83 F. App'x 692 (6th Cir. 2003) ................................................... 27

*Coulter-Owens v. Time Inc.,*
    695 F. App'x 117 (6th Cir. 2017). .................................................. 7

*Gascho v. Glob. Fitness Holdings, LLC,*
    822 F.3d 269 (6th Cir. 2016) .................................... 10, 14, 15, 20

*Geier v. Sundquist,*
    372 F.3d 784 (6th Cir. 2004) ...................................................... 27

*Hadix v. Johnson,*
 322 F.3d 895 (6th Cir. 2003) .................................................. 29, 30

*In re Pampers Dry Max Litig.,*
 724 F.3d 713 (6th Cir. 2013) ....................................................... 30

*Isabel v. City of Memphis,*
 404 F.3d 404 (6th Cir. 2005) ....................................................... 26

*Lane v. Facebook, Inc.,*
 696 F.3d 811 (9th Cir. 2012) ....................................................... 16

*Mathias v. Accor Econ. Lodging, Inc.,*
 347 F.3d 672 (7th Cir. 2003) ....................................................... 13

*Parker v. Time Warner Entm't Co.,*
 331 F.3d 13 (2d Cir. 2003) ..................................................... 17, 18

*Ramey v. Cincinnati Enquirer, Inc.,*
 508 F.2d 1188 (6th Cir. 1974) ................................................. 13, 28

*Rawlings v. Prudential-Bache Props., Inc.,*
 9 F.3d 513 (6th Cir. 1993) ..................................................... 10, 11

*Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.,*
 825 F.3d 299 (6th Cir. 2016) ....................................................... 30

*Van Horn v. Nationwide Property & Cas. Ins. Co.,*
 436 F. App'x 496 (6th Cir. 2011)........................................... 26, 27, 28

**United States District Court Cases**

*Appoloni v. United States,*
 218 F.R.D. 556 (W.D. Mich. 2003)......................................... 20, 21

*Connectivity Sys. Inc. v. Nat'l City Bank,*
 2011 WL 292008 (S.D. Ohio Jan. 26, 2011) .................................28

*Coulter-Owens v. Rodale, Inc.,*
 1:14-cv-12688-RHC-RSW (E.D. Mich.).......................... 12, 15, 21

*Dick v. Sprint Commc'ns Co. L.P.*,
    297 F.R.D. 283 (W.D. Ky. 2014) ................................................................ 14

*Doe 1-2 v. Deja Vu Servs., Inc.*,
    2017 WL 2629101 (E.D. Mich. June 19, 2017) ........................................ 19

*Fournier v. PFS Invs., Inc.*,
    997 F. Supp. 828 (E.D. Mich. 1998) ................................................. 11, 12

*Gross v. Symantec Corp.*,
    No. 12-cv-00154 (N.D. Cal. March 21, 2014) ............................................ 27

*Halaburda v. Bauer Publ'g Co, LP*,
    2:12-cv-12831 (E.D. Mich.) ...........................................................*passim*

*Harris v. comScore*,
    No. 11-cv-05807 (N.D. Ill. 2014) ............................................................. 25

*Hillson v. Kelly Servs. Inc.*,
    2017 WL 3446596 (E.D. Mich. Aug. 11, 2017) ........................................ 11

*In re Cardizem CD Antitrust Litig.*,
    218 F.R.D. 508 (E.D. Mich. 2003) ...................................................*passim*

*In re Cincinnati Gas & Elec. Co. Sec. Litig.*,
    643 F. Supp. 148 (S.D. Ohio 1986) ............................................................ 13

*In re CMS Energy ERISA Litig.*,
    2006 WL 2109499 (E.D. Mich. June 27, 2006) ........................................ 29

*In re Delphi Corp. Secs., Derivative & ERISA Litig.*,
    248 F.R.D. 483 (E.D. Mich. 2008) ............................................. 10, 14, 25

*In re Dun & Bradstreet Credit Servs. Customer Litig.*,
    130 F.R.D. 366 (S.D. Ohio 1990) ............................................................. 19

*In re Facebook Privacy Litig.*,
    No. 10-cv-02389 (N.D. Cal. 2010) ............................................................ 25

*In re Google Buzz Privacy Litig.*,
   2011 WL 7460099 (N.D. Cal. June 2, 2011) ................................................ 16

*In re Netflix Privacy Litig.*,
   No. 11-cv-00379 (N.D. Cal. Aug. 12, 2011) ......................................... 16, 25

*In re Rio Hair Naturalizer Prods. Liab. Litig.*,
   1996 WL 780512 (E.D. Mich. Dec. 20, 1996) ....................................*passim*

*In re S. Ohio Corr. Facility*,
   173 F.R.D. 205 (S.D. Ohio 1997)................................................................. 13

*In re Se. Milk Antitrust Litig.*,
   2013 WL 2155387 (E.D. Tenn. May 17, 2013) ........................................... 19

*Kelly v. Corrigan*,
   890 F. Supp. 2d 778 (E.D. Mich. 2012) ...................................................... 12

*Kinder v. Meredith Corp.*,
   1:14-cv-11284 (E.D. Mich.) .................................................................*passim*

*Kogan v. AIMCO Fox Chase L.P.*,
   193 F.R.D. 496 (E.D. Mich. 2000) ........................................................ 22, 26

*Kulesa v. PC Cleaner*,
   No. 12-cv-0725 (C.D. Cal. Aug. 26, 2014) ................................................. 27

*Lasalle Town Houses Coop Assoc. v. City of Detroit*,
   2016 WL 1223354 (E.D. Mich. Mar. 29, 2016) .......................................... 29

*Manners v. Am. Gen. Life Ins. Co.*,
   1999 WL 33581944 (M.D. Tenn. Aug. 11, 1999)........................................ 28

*Merkner v. AK Steel Corp.*,
   2011 WL 13202629 (S.D. Ohio Jan. 10, 2011) ..................................... 28, 29

*Moeller v. Am. Media, Inc.*,
   No. 5:16-cv-11367-JEL-EAS (E.D. Mich.)..........................................*passim*

*Leonhardt v. ArvinMeritor, Inc.*,
    581 F. Supp. 2d 818 (E.D. Mich. 2008) ...................................................... 18

*N.Y.S. Teachers' Ret. Sys. v. Gen. Motors Co.*,
    315 F.R.D. 226 (E.D. Mich. 2016) ............................................................. 11

*Perlin v. Time Inc.*,
    No. 16-cv-10635 (E.D. Mich.) ...........................................................*passim*

*Simpson v. Citizens Bank*,
    2014 WL 12738263 (E.D. Mich. Jan. 31, 2014) ......................................... 13

*Stanley v. U.S. Steel Co.*,
    2009 WL 4646647 (E.D. Mich. Dec. 8, 2009) ..................................... 10, 21

*Wise v. Popoff*,
    835 F. Supp. 977 (E.D. Mich. 1993) ......................................................... 11

**State Court Cases**

*Beaumont v. Brown*,
    257 N.W.2d 522 (Mich. 1977) ..................................................................... 3

*Bradley v. Saranac Cmty. Sch. Bd. of Educ.*,
    835 F. Supp. 977 (E.D. Mich. 1993) ........................................................... 3

*Hawley v. Prof'l Credit Bureau, Inc.*,
    76 N.W.2d 835 (Mich. 1956) ....................................................................... 3

**Statutory Provisions**

28 U.S.C. § 1332 ................................................................................................... 5

Fed. R. Civ. P. 12 ........................................................................................... 5, 22

Fed. R. Civ. P. 23 ........................................................................................... 2, 10

M.C.L. § 445.1711-15 ................................................................................ 1, 3, 4, 5

**Other Authorities**

*Privacy: Sales, Rentals of Videos, etc.*,
      House Legislative Analysis Section, H.B. 5331, Jan. 20, 1989 ................. 18

S.B. 490, 98th Leg. Reg. Sess. (Mich. 2016) ......................................................... 18

S.B. 984, 99th Leg. Reg. Sess. (Mich. 2018) ......................................................... 18

## I.      INTRODUCTION

The Class Action Settlement Agreement between Plaintiff Tom Higgins

("Plaintiff" or "Higgins") and Defendant TV Guide Magazine, LLC ("Defendant"

or "TV Guide") (together, the "Parties") is the result of Class Counsel's vigorous

prosecution of TV Guide over the past three years for its alleged violations of the

Michigan Preservation of Personal Privacy Act, M.C.L. § 445.1711-15 ("PPPA").[1]

Preliminary approval having been granted, Plaintiff now respectfully requests that

the Court approve his request for attorneys' fees, expenses, and an incentive award.

Class Counsel's efforts throughout this litigation has resulted in an

exceptional, multi-part settlement for Plaintiff and the class. Under the proposed

Settlement—which was preliminarily approved on September 18, 2018—

Defendant has agreed to create a $1.7 million non-reversionary common fund from

which Settlement Class Members who make valid claims will receive a *pro rata*

cash payment. Notably, the recovery per class member—estimated to be between

$50 and $100—is in line with (and may ultimately exceed) the cash payments

recovered in the five previous PPPA settlements with other magazine publishers

and dwarfs the recovery typically obtained in statutory privacy class actions.

---

[1]      A copy of the Parties' Class Action Settlement Agreement ("Settlement" or
"Agreement") is attached hereto as Exhibit 1. Except as otherwise indicated, all
defined terms used herein shall have the same meanings ascribed to them in the
Agreement.

Equally important, the Settlement achieves one of the primary goals of this lawsuit: putting an end to Defendant's alleged practice of disclosing its Michigan customers' personal reading habits to third parties.

Obtaining this valuable relief did not come easily. Rather, Class Counsel battled through years of hard-fought litigation, which included investigation into TV Guide's disclosure practices, complex motion practice on the pleadings, and extensive discovery (including multiple depositions, substantial third-party discovery, and the exchange and analysis of thousands of documents). Even then, numerous rounds of arm's-length settlement negotiations were required before finally reaching the Settlement that forms the basis for the requested fees and expenses.

In light of Class Counsel's efforts and the exceptional result achieved, Plaintiff respectfully requests pursuant to Federal Rule of Civil Procedure 23(h) that the Court approve attorneys' fees and expenses of 35% of the Settlement Fund, or $595,000, as well as an incentive award of $5,000 for Plaintiff for his service as Class Representative. As set forth below, the requested fee and incentive award fairly compensate Plaintiff and Class Counsel for the time and effort expended in the case, and reflect the results achieved for the Settlement Class and the substantial risks that they faced throughout the pendency of the litigation. The Court should therefore approve the requested attorneys' fees, expenses, and

incentive award.

## II.    FACTUAL BACKGROUND AND UNDERLYING LAW

A brief summary of the PPPA, the litigation performed by Class Counsel for the Settlement Class's benefit, and the beneficial terms of the Settlement provide necessary context to the reasonableness of the requested fees and incentive award.

### A.    Plaintiff's Allegations Under the PPPA.

Michigan was "one of the first jurisdictions to acknowledge the concept of [a] 'right of privacy.'" *Beaumont v. Brown*, 257 N.W.2d 522, 526 (Mich. 1977), *overruled on other grounds by Bradley v. Saranac Cmty. Sch. Bd. of Educ.*, 565 N.W.2d 650 (Mich. 1997). This right protects against the "unreasonable and serious interference with [a citizen's] interest in not having his affairs known to others." *Hawley v. Prof'l Credit Bureau, Inc.*, 76 N.W.2d 835, 841 (Mich. 1956) (Smith, J. dissenting). The PPPA follows this tradition and prohibits retailers, publishers, and other entities engaged in the business of selling written materials at retail from disclosing records or information concerning the purchase of those materials by a customer that indicates the identity of the customer. M.C.L. § 445.1712. The Michigan Legislature rightfully recognized that a person's choice in reading materials "is nobody's business but one's own," and passed the PPPA "to explicitly protect a consumer's privacy in buying and borrowing" such materials. *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B.

5331, Jan. 20, 1989. Given the importance of reader privacy, the version of the PPPA at issue here (i.e., the version that existed prior to the Michigan Legislature's 2016 amendments) provides for statutory damages of $5,000 per violation. M.C.L. § 445.1715.

Defendant TV Guide Magazine publishes the widely popular magazine titles *TV Guide Magazine* and *TV Weekly*. (*See* dkt. 64, Plaintiff's First Amended Class Action Complaint ["FAC"] ¶ 1.) Plaintiff alleges that in addition to its consumer-facing magazine subscription business, TV Guide operates a division dedicated to selling information related to its customers' magazine subscription histories and personal reading habits. (*Id.* ¶¶ 2, 22, 24–26, 51–53, 60.) But it doesn't just sell lists of names that subscribe to *TV Guide Magazine* and *TV Weekly*. Rather, to increase the value of such information, Plaintiff alleges that Defendant trades its customers' protected reading information with certain data miners and other third parties in exchange for other demographic and lifestyle data that such companies have already gathered (or "mined") on each subscriber. (*Id.* ¶¶ 2, 19, 22, 26, 34–35.) Defendant allegedly thereafter "enhances" its own customer profiles with this additional data (e.g., their income levels, religion, ages, race, political affiliations, travel habits, medical conditions, etc.), and then sells the enhanced information to other unrelated third parties for profit. (*Id.* ¶¶ 2, 19, 26, 37, 60.)

4

Plaintiff further alleges that no matter how they subscribe, whether via postcard, online, or over the phone, customers never provide consent to disclose information to third parties related to their magazine subscriptions. (*Id.* ¶¶ 3, 27, 33–38, 56, 57.) This is because, as Plaintiff alleges, TV Guide's subscribers are never presented with or required to consent to any terms informing them of Defendant's disclosure practices. (*Id.*) Plaintiff also alleges that even after subscribing, TV Guide fails to notify customers that it will disclose any information to third parties, let alone their protected reading information. (*Id.* ¶¶ 3, 27, 32–35, 56.) Nonetheless, Plaintiff alleges that TV Guide is in the business of disclosing all of its subscribers' protected reading information to various third parties, without first obtaining their consent. (*Id.* ¶¶ 2, 3, 26.)

## B. The Litigation and Work Performed to Benefit the Class.

As a result of Defendant's alleged conduct, on October 26, 2015, this putative class action was filed in the United States District Court for the Eastern District of Michigan by then-plaintiff Shirley Hyman. (Dkt. 1.) In response, on April 1, 2016, Defendant filed a motion to dismiss the complaint under Rule 12(b)(1), arguing, *inter alia*, that the Court lacked subject matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because (i) its LLC members resided in Michigan, and thus diversity of citizenship was lacking between it and the putative class of Michigan subscribers, and (ii) Plaintiff could

not meet CAFA's $5 million jurisdictional minimum due to a proposed amendment to the PPPA that, according to Defendant, would bar recovery of any statutory damages. (Dkts. 9, 13, 15.) Three days later, on April 4, 2016, Defendant filed a motion to stay class discovery pending adjudication of its motion to dismiss and the enactment of the proposed amendment to the PPPA. (Dkt. 11.)

The parties thereafter entered into a stipulation permitting plaintiff Hyman to conduct discovery on the jurisdictional issues raised by Defendant's motion to dismiss, namely the citizenship of Defendant's LLC members and the location of its "nerve center." (Dkt. 19.) Pursuant to that agreement, Defendant produced hundreds of documents in response to plaintiff Hyman's written discovery requests and produced two of its officers—Lawrence MacKenzie and Paul Turcotte—for depositions. (Declaration of Ari J. Scharg in Support of Plaintiff's Motion for Attorneys' Fees, Expenses, and Incentive Award ["Scharg Decl."], attached hereto as Exhibit 2, ¶ 5.) Class Counsel thoroughly reviewed the produced documents and, on June 16, 2016, deposed TV Guide's witnesses in New York City. (*Id.*)

Following the completion of jurisdictional discovery, the Parties completed briefing on Defendant's motions to dismiss and stay. (*See* dkts. 21, 24.) Shortly thereafter, the Court requested supplemental briefing from the parties addressing the effect, if any, of the Supreme Court's then-recent decision on Article III standing in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). (Dkt. 27.) Class

Counsel, on behalf of plaintiff, promptly submitted the requested briefing, explaining that *Spokeo* confirmed that plaintiff Hyman has Article III standing because TV Guide's undisputed disclosure of her personal reading choices was an invasion of her legally protected privacy interest. (Dkt. 29.) Before ruling on the motion to dismiss, on August 22, 2016, the Court stayed the case pending the Sixth Circuit's decision in *Coulter-Owens v. Time Inc.*, Nos. 16-1321 & 16-1380, where the appellate court was considering, in light of *Spokeo* and the 2016 amendments to the PPPA, whether an alleged PPPA violation provides Article III standing. (Dkt. 32.) After the Sixth Circuit issued its decision in *Coulter-Owens*, the Court lifted the stay, (dkt. 38), and denied Defendant's motion to dismiss in its entirety (dkt. 41). Defendant thereafter answered the complaint by denying the allegations and raising 18 affirmative defenses, including that TV Guide does not sell magazines "at retail" and that the statutory damages sought violate TV Guide's due process rights. (Dkt. 43.)

With the pleadings settled, Hyman and Defendant exchanged initial disclosures and began discovery. (Scharg Decl. ¶ 6.) Hyman then served subpoenas on five third-party vendors, including Wiland Direct, Epsilon Data Management, and I-Behavior, to obtain documents and deposition testimony from five entities to whom she believed, based on Defendant's written discovery responses, TV Guide disclosed subscriber information to. (*Id.* ¶ 7.) Over the next eight months, Hyman

and Defendant engaged in substantial class- and merits-related discovery, which included the production and review of thousands of pages of documents, numerous meet and confer conferences, and expert review of various transmission and data logs produced by the five third-party vendors. (*Id.* ¶ 8.) Throughout discovery, the parties discussed the possibility of early resolution and kept lines of communication open regarding settlement. (*Id.* ¶ 9.)

Unfortunately, as the discovery deadline approached, Hyman suffered a severe health issue which rendered her unable to continue serving as the class representative. (*Id.* ¶ 10.) As a result, Class Counsel and Defendant's counsel met and conferred on this matter and Defendant agreed to allow another class member—Tom Higgins, a Michigan resident whose claims are virtually identical to Hyman's—to substitute into the case, subject to Court approval. (*Id.* ¶ 11.) The Court granted the Parties' jointly filed motion to substitute Tom Higgins into the case as the lead plaintiff, (dkt. 63), and he filed an amended complaint (dkt. 64).

Higgins then issued amended discovery requests to Defendant, and the Parties scheduled his deposition. (Scharg Decl. ¶ 12.) At that point, the Parties resumed settlement discussions and, per the Court's order, scheduled an in-person private mediation to take place on August 1, 2018 in an effort to resolve the case without the expense of further litigation, which would necessarily include adversarial class certification and summary judgment briefing. (*Id.* ¶ 13; *see* dkt.

66.) After multiple rounds of arm's-length negotiations in the weeks leading up to mediation, the Parties were able to reach agreement on the principal terms of the Settlement. (Scharg Decl. ¶ 14.) The Parties then diligently prepared and executed the written Settlement Agreement, which the Court preliminarily approved on September 18, 2018. (*Id*. ¶ 15; dkt. 73.)

### C.    The Terms of the Settlement Agreement.

Class Counsel's efforts vigorously prosecuting this case against TV Guide over the past three years has resulted in an excellent deal for the Settlement Class, delivering both immediate cash relief and significant prospective relief to approximately 90,000 magazine subscribers across the state of Michigan. (Scharg Decl. ¶¶ 16–17.) Specifically, the Settlement creates a non-reversionary $1,700,000 Settlement Fund (Agreement ¶¶ 1.31, 2.1(a)), from which claiming Settlement Class Members will receive a *pro rata* cash payment. (*Id.* ¶ 2.1(b).) The Settlement also achieves one of the primary purposes of the lawsuit: prohibiting Defendant from disclosing its Michigan customers' subscription information to any third-party companies, without first obtaining their express written consent. (*Id.* ¶ 2.2(a).)

On the basis of this relief, Plaintiff moves for an award of attorneys' fees of $595,000 and an incentive award of $5,000. As explained in detail below, the requested attorneys' fees and incentive award are reasonable.

## III.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND SHOULD BE APPROVED.

The requested fee award of $595,000, representing 35% of the common fund, is reasonable and merits approval. Under Federal Rule of Civil Procedure 23(h), courts may award "reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."[2] Fed. R. Civ. P. 23(h); *Stanley v. U.S. Steel Co.*, 2009 WL 4646647, at *1 (E.D. Mich. Dec. 8, 2009). Here, the preliminarily approved Class Action Settlement Agreement between the Parties provides that Class Counsel may petition the Court for an award up to 35% of the Settlement Fund. (Agreement ¶ 8.1.)

In common-fund cases such as this one, courts in the Sixth Circuit apply one of two fee calculation methods—percentage-of-the-fund or lodestar—and under either method, the fees must "be reasonable under the circumstances." *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516-17 (6th Cir. 1993). While the Court has discretion in deciding whether to apply the percentage-of-the-fund calculation or the lodestar method, *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 280 (6th Cir. 2016), whichever method it ultimately selects must be justified by "a clear

---

[2]   The requested fee award also encompasses unreimbursed litigation expenses. (Agreement ¶ 8.1.) Reasonable litigation-related expenses are customarily awarded in common-fund cases and include costs such as document preparation and travel. *In re Delphi Corp. Secs., Derivative & ERISA Litig.*, 248 F.R.D. 483, 504 (E.D. Mich. 2008). Thus, included in the requested fee award are $6,465.55 of out-of-pocket expenses in these standard categories. (*See* Scharg Decl. ¶ 25.)

statement of the reasoning used in adopting a particular methodology and the factors considered in arriving at that fee," keeping the unique circumstances of each case in mind. *Id*. (quoting *Rawlings*, 9 F.3d at 516).

### A.   The Percentage Method Should Be Used to Calculate Fees.

Notwithstanding the Court's discretion in selecting a method for calculating fees, courts generally prefer to use the percentage-of-the-fund method in common fund cases such as this. *See, e.g.*, *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 532 (E.D. Mich. 2003) ("This Court's decision to apply the percentage-of-the-fund method is consistent with the majority trend."); *Fournier v. PFS Invs., Inc.*, 997 F. Supp. 828, 831-32 (E.D. Mich. 1998) ("[M]any courts have strayed from using lodestar in common fund cases and moved towards the percentage of the fund method which allows for a more accurate approximation of a reasonable award for fees."); *Wise v. Popoff*, 835 F. Supp. 977, 980 (E.D. Mich. 1993) (same); *Hillson v. Kelly Servs. Inc.*, 2017 WL 3446596, at *2 (E.D. Mich. Aug. 11, 2017) (stating that "[t]he percentage-of-recovery approach is 'easy to calculate' and 'establishes reasonable expectations on the part of plaintiffs' attorneys[.]'").

This is so because while "[t]he lodestar method better accounts for the amount of work done . . . the percentage of the fund method more accurately reflects the results achieved." *N.Y.S. Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 243 (E.D. Mich. 2016); *see also Fournier*, 997 F. Supp. at 831

11

(explaining that the lodestar method should be avoided in situations where a common fund exists and the lodestar method will not "adequately acknowledge . . . the result achieved"). Thus, the percentage-of-the-fund approach better incentivizes attorneys to maximize recovery for absent class members. In fact, the percentage-of-the-fund method has been used to determine a reasonable fee award in the five other major PPPA class action settlements in this District. *Halaburda v. Bauer Publ'g Co., LP*, No. 12-cv-12831, dkt. 68 (E.D. Mich. 2015); *Kinder v. Meredith Corp.*, No. 13-cv-11284, dkt. 81 (E.D. Mich. 2016); *Coulter-Owens v. Rodale, Inc.*, No. 14-cv-12688, dkt. 54 (E.D. Mich. Sep. 29, 2016); *Moeller v. Am. Media, Inc.*, No. 5:16-cv-11367, dkt. 42 (E.D. Mich. June 8, 2017); *Perlin v. Time Inc.*, No. 16-cv-10635, dkt. 55 (E.D. Mich. Oct. 15, 2018).

In contrast, the lodestar approach hasn't once been used to evaluate fees in these cases. That approach is most often applied in federal fee-shifting cases, particularly civil rights actions. *See, e.g., Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010); *Kelly v. Corrigan*, 890 F. Supp. 2d 778, 787 (E.D. Mich. 2012).

For these reasons, the Court should not hesitate to use the percentage-of-the-fund method in this case.

**B.     The Reasonableness of the Requested Fees is Supported by This Circuit's Six-factor Test.**

The Sixth Circuit has articulated six factors that should be considered when

determining the reasonableness of a requested percentage to award as attorneys'

fees: (1) the value of the benefit to the class; (2) society's stake in rewarding

attorneys who produce the settlement's benefits, to maintain an incentive to others;

(3) whether the work was performed on a contingent fee basis; (4) the complexity

of the litigation; (5) the skill and standing of counsel on both sides; and (6) the

value of the legal services performed on an hourly basis. *Ramey v. Cincinnati*

*Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974); *Bowling v. Pfizer, Inc.*, 102

F.3d 777, 780 (6th Cir. 1996); *In re Cardizem*, 218 F.R.D. at 533.

A "reasonable" fee in common-fund cases "typically rang[es] from 20 to 50

percent of the fund." *In re Rio Hair Naturalizer Prod. Liab. Litig.*, 1996 WL

780512, at *16 (E.D. Mich. Dec. 20, 1996); *In re S. Ohio Corr. Facility*, 173

F.R.D. 205, 217 (S.D. Ohio 1997) ("Typically, the percentage awarded ranges

from 20 to 50 percent of the common fund created."); *Simpson v. Citizens Bank*,

2014 WL 12738263, at *6 (E.D. Mich. Jan. 31, 2014) ("[D]istrict courts in the

Sixth Circuit begin with a 'benchmark percentage' ranging between 20-50%")

(citing *In re Cincinnati Gas & Elec. Co. Sec. Litig.*, 643 F. Supp. 148, 150 (S.D.

Ohio 1986)); *see also Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 677

(7th Cir. 2003) (Posner, J.) (referring to the "usual 33-40 percent contingent fee"

charged by plaintiff's lawyers). In PPPA cases in particular, courts in this District

have awarded up to 40% of the common fund in attorneys' fees, *Perlin*, No. 16-cv-

10635, dkt. 55, and have regularly awarded the 35% requested here, *see Kinder*, No. 13-cv-11284, dkt. 81; *Moeller*, No. 5:16-cv-11367, dkt. 42. The amount awarded is calculated as a percentage "from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Gascho,* 822 F.3d at 282 (calculating the percentage, as "[a]ttorney's fees are the numerator" and "the dollar amount of the Total Benefit to the class (which includes the 'benefit to class members,' the attorney's fees, and [potentially] the costs of administration)" is the denominator).

In this case, each of the relevant factors supports the requested fee award, and as such, the Court should find a fee award of 35% reasonable.

### 1.   *Class Counsel have secured a valuable benefit for the class.*

The value of the benefit to the class is the most important factor in assessing the reasonableness of fees. *Dick v. Sprint Commc'ns Co. L.P.*, 297 F.R.D. 283, 299 (W.D. Ky. 2014); *In re Delphi*, 248 F.R.D. at 503 (describing the result achieved for the class as "[t]he primary factor"). Assessing the overall value includes consideration of both tangible and intangible benefits. *See Gascho*, 822 F.3d at 282 (requiring "appropriate consideration" of "cash and noncash settlement components" in assessing the total benefits to the class). The risk of continued litigation can also be considered in relation to the value of the benefit to the class under this factor. *Dick*, 297 F.R.D. at 299.

The instant Settlement is a great result for the Class, offering immediate cash payments to Settlement Class Members with no monies reverting to Defendant. (Agreement ¶¶ 1.32, 2.1(a)-(d).) Specifically, the Settlement creates a $1.7 million Settlement Fund for the benefit of approximately 90,000 class members who, based on anticipated claims rates, should expect to recover approximately $50–100 per person.[3] (Scharg Decl. ¶ 17.) This cash payment falls in line with—and may even exceed—the payments class members have received in previous PPPA settlements in this District. *See, e.g., Rodale,* No. 14-cv-12688, dkt. 54 (securing a $4.5 million fund for a class of approximately 580,000 subscribers under PPPA with claiming class members receiving a *pro rata* payment of approximately $44); *Perlin*, No. 16-cv-10635, dkt. 55 (securing a $7.4 million fund for a class of approximately 600,000 subscribers under PPPA with claiming class members receiving a *pro rata* payment of approximately $50); *Kinder*, No. 13-cv-11284, dkt. 81 (securing a $7.5 million fund for a class of approximately 980,000 subscribers under PPPA with claiming class members receiving a *pro rata* payment of approximately $50); *Halaburda*, No. 12-cv-12831, dkt. 68 (securing a

---

[3] This estimation is based upon a participation rate of 10 to 20%, which is typical in PPPA class action settlements and is on the high end of consumer class action claims rates in general. *See Perlin*, No. 16-cv-10635, dkt. 55 (achieving claims rate of over 13% in PPPA case); *Gascho*, 822 F.3d at 290 (crediting expert testimony "that response rates in class actions generally range from 1 to 12 percent, with a median response rate of 5 to 8 percent.").

$775,000 fund for a class of 40,000 subscribers under PPPA with claiming class members receiving a *pro rata* payment of approximately $74); *Moeller*, No. 5:16-cv-11367, dkt. 42 (securing a $7.6 million fund for a class of 415,000 subscribers under PPPA with claiming class members receiving an estimated $100).

And when compared to the typical privacy class action settlement, the anticipated $50–100 *pro rata* payments are quite remarkable, where more often than not these cases have featured enormous classes and money only going to *cy pres* and not individual class members. *See, e.g.*, *Lane v. Facebook, Inc.*, 696 F.3d 811, 820-22 (9th Cir. 2012) (affirming $9.5 million settlement providing *cy pres* payment as sole monetary relief in case where statutory damages of up to $10,000 per claim were available in class of millions), *cert. denied* 134 U.S. 8 (Nov. 4, 2013); *In re Google Buzz Privacy Litig.*, 2011 WL 7460099, at *3-5 (N.D. Cal. June 2, 2011) (approving $8.5 million settlement providing *cy pres* payment as sole monetary relief in case where statutory damages of up to $10,000 per claim were available in a class of millions); *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6-7 (N.D. Cal. Mar. 18, 2013) (approving $9 million settlement providing *cy pres* payment as sole monetary relief in case where statutory damages of $2,500 per claim were available to class of millions).

And as far as PPPA class actions, specifically, the requested 35% is consistent with percentage awards in previous cases in this District. *See, e.g.,*

16

*Perlin*, No. 16-cv-10635, dkt. 55 (awarding 40% of $7.4 million common fund);
*Kinder*, No. 13-cv-11284, dkt. 81 (awarding 35% of $7.5 million common fund);
*Moeller*, No. 5:16-cv-11367, dkt. 42 (awarding 35% of $7.6 million common fund).

Moreover, in light of the risks associated with continued litigation, the Settlement is an outstanding result. Had the Parties not reached a resolution, Defendant was sure to assert a number of defenses on the merits, including that the PPPA (i) does not prohibit the disclosure of the magazine subscription information at issue, because the recipients of the disclosures are its agents or the disclosures were permissible under the PPPA's "direct marketing exception," and (ii) does not apply to TV Guide at all because TV Guide is not engaged in the business of selling magazines "at retail," as is required under the scope of the Statute. (Scharg Decl. ¶ 21.) (*See* dkt. 43 (asserting 18 affirmative defenses).) TV Guide has also made clear that it would continue to challenge the constitutionality of the PPPA. (*See id.*)

Looking beyond summary judgment and trial, Plaintiff is also keenly aware of the fact that Defendant would appeal the merits of any adverse decision, and that in light of the large aggregate statutory damages in play it would attempt to argue—in both the trial and appellate courts—for a reduction of damages based on due process concerns. (Scharg Decl. ¶ 21.); *see, e.g.*, *Parker v. Time Warner*

17

*Entm't Co.*, 331 F.3d 13, 22 (2d Cir. 2003) ("[T]he potential for a devastatingly large damages award, out of all reasonable proportion to the actual harm suffered by members of the plaintiff class, may raise due process issues.").

Furthermore, recent legislative efforts seeking to weaken the protections and remedies available under the PPPA pose a significant risk that Plaintiff and the Class would recover nothing even if they proved TV Guide's liability. Indeed, on April 13, 2016—less than six months after Plaintiff filed suit—the Michigan Legislature passed an amendment to the PPPA that added certain exceptions to the statute's confidentiality requirement and repealed its statutory damages provision prospectively. *See* S.B. 490, 98th Leg. Reg. Sess. (Mich. 2016). Though the 2016 amendment only applied to claims that, unlike Higgins', accrued after the July 31, 2016 effective date, another bill was introduced on May 8, 2018, that, if successful, would repeal the statutory damages provision retroactively, meaning the PPPA's $5,000 statutory damages would not be an available remedy to Plaintiff and the Class in this case. *See* S.B. 984, 99th Leg. Reg. Sess. (Mich. 2018). *See, e.g.*, *Leonhardt v. ArvinMeritor, Inc.*, 581 F. Supp. 2d 818, 836 (E.D. Mich. 2008) ("[A]bsent settlement, all class members would be subject to the uncertainty, risk, hardship and delay attendant to continued litigation which ultimately might leave them with absolutely nothing.").

And, although Class Counsel do not assign a monetary value to the

18

prospective relief the Settlement affords, there is no doubt that this relief is valuable to the class as well—indeed it was the paramount goal of this lawsuit. *See, e.g., Doe 1-2 v. Deja Vu Servs., Inc.*, 2017 WL 2629101, at \*11 (E.D. Mich. June 19, 2017) (considering changes to defendants' business practices in analyzing the benefit to the class); *In re Se. Milk Antitrust Litig.*, 2013 WL 2155387, at \*3 (E.D. Tenn. May 17, 2013) (considering structural changes to industry practices in assessing value of benefit); *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 373 (S.D. Ohio 1990) (considering non-monetary benefits requiring changes in defendant's operating procedures in assessing value of benefit). Here, the Settlement's prospective relief provides additional value to the class by ensuring that, for a period of four years, Defendant will not disclose its Michigan customers' subscriber information to third parties without prior express written consent. (Agreement ¶ 2.2(a).) *See, e.g.*, *Halaburda*, dkt. 69 at 19 (E.D. Mich. Jan. 6, 2015) (Steeh, J.) (finally approving a class action in similar PPPA litigation and finding that "the more important provisions of the settlement agreement are the provisions according equitable relief and a cessation of the disclosure altogether for this period of four years by the defendants.").

Weighed against the risks of continued litigation—including TV Guide's numerous defenses on the merits, the legislative efforts that threaten the PPPA's available statutory damages, and potentially other obstacles that could strip the

class of any recovery—the value of the immediate cash and prospective relief that the Settlement affords supports the reasonableness of the requested attorneys' fees. The first factor is well satisfied.

> ### 2.   *Society has a stake in incentivizing the pursuit of complex consumer privacy litigation.*

Society has a strong stake in rewarding attorneys who produce the type of benefits achieved by the settlement here. *See In re Cardizem*, 218 F.R.D. at 533; *see also Gascho*, 822 F.3d at 287 ("Consumer class actions . . . have value to society more broadly, both as deterrents to unlawful behavior . . . and as private law enforcement regimes that free public sector resources."). It is therefore in society's interest to encourage litigation that protects important consumer privacy rights that would not otherwise be safeguarded. *In re Rio*, 1996 WL 780512, at *17 ("Without compensation to those who are willing to undertake the inherent complexities and unknowns of consumer class action litigation, enforcement of the federal and state consumer protection laws would be jeopardized[.]"); *In re Cardizem,* 218 F.R.D. at 534 ("Encouraging qualified counsel to bring inherently difficult and risky but beneficial class actions . . . benefits society."). Further, when individual class members seek a relatively small amount of statutory damages, "economic reality dictates that [their] suit proceed as a class action or not at all." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974); *Appoloni v. United*

*States*, 218 F.R.D. 556, 563 (W.D. Mich. 2003), *amended*, 219 F.R.D. 116 (W.D. Mich. 2003).

Society undoubtedly has a strong interest in incentivizing lawyers to bring complex litigation that is necessary to protect the privacy of Michiganders' personal reading choices. *See Rodale*, No. 14-cv-12688, dkt. 54 (finding that "[s]ociety has an interest in incentivizing the plaintiffs' bar to investigate and litigate [PPPA] cases through the award of contingent fees"). In fact, class action litigation in this area is the most realistic means of safeguarding the privacy of readers under the PPPA, given the complexity and cost of this and similar litigation compared with the potential individual recovery. Thus, the realistic alternative to a class action in this case would have been no enforcement at all, permitting Defendant's allegedly unlawful conduct to continue unabated. This factor thus supports the requested fee award.

### 3.   *Class Counsel took the case on a contingent basis, confronting a significant risk of nonpayment.*

The fact that Class Counsel litigated this case on a contingency fee basis lends additional support to the reasonableness of the requested fee award. *See In re Cardizem,* 218 F.R.D. at 533; *Stanley*, 2009 WL 4646647, at *3 ("Numerous cases recognize that the contingent fee risk is an important factor in determining the fee award."). When attorneys invest significant time and resources in pursuing the litigation, in spite of the risk they will not be compensated, courts generally find

this factor weighs in favor of granting the requested fees. *In re Rio*, 1996 WL

780512, at *18; *Kogan v. AIMCO Fox Chase L.P.*, 193 F.R.D. 496, 504 (E.D.

Mich. 2000). The contingent nature of the case is amplified where class counsel

face a formidable defendant. *See In re Cardizem,* 218 F.R.D. at 533.

 As reflected in both former plaintiff Hyman's and Plaintiff Higgins' retainer

agreements, Class Counsel pursued this action purely on a contingency basis.

(Scharg Decl. ¶ 18.) For over three years, Class Counsel has invested significant

time, effort, and resources to the litigation without any compensation. (*Id.* ¶ 19.)

Cognizant of the risk of nonpayment, Class Counsel nonetheless embarked on a

fact-intensive investigation of TV Guide's practices, engaged in robust Rule

12(b)(1) motion practice, deposed two of TV Guide's officers, exchanged

extensive formal and informal discovery, including substantial third-party

discovery and the review of thousands of documents, and eventually, engaged in

meaningful settlement discussions and numerous rounds of arm's-length

negotiations. (*Id.* ¶ 20.) At all times Class Counsel fronted this investment of time

and resources, despite the significant risk of nonpayment inherent in this case. (*Id.*

¶ 21.) And given the defenses mounted by TV Guide, as well as the fairly limited

history of PPPA litigation, success on the legal issues presented was far from

certain. (*Id.*)

 Given the contingent nature of the litigation and the significant risk of

22

nonpayment, the third factor also supports the reasonableness of the requested fee award.

### 4.    *The complexity of the litigation supports the requested fees.*

The complexity of the litigation reinforces the reasonableness of a requested fee award. *In re Cardizem*, 218 F.R.D. at 533. This case involved multiple layers of factual complexity, beginning with an extensive preliminary investigation into TV Guide's business practices, its methods of data collection and aggregation, and the nature of its relationships with various third-party companies. (Scharg Decl. ¶ 20.) The case also required jurisdictional discovery into the location of TV Guide's "nerve center," which entailed substantial written discovery and the depositions of two TV Guide representatives. (*Id.* ¶¶ 4–5.) Finally, to thoroughly assess the merits of the case, Class Counsel obtained and reviewed thousands of documents—both from TV Guide and numerous third parties—throughout class- and merits-related discovery. (*Id.* ¶¶ 6–8.)

The case involved complex legal issues as well. At the motion to dismiss stage, Defendant raised the novel issue of whether the Michigan Legislature's proposed amendment to the PPPA would apply retroactively to bar plaintiff's claims for statutory damages, an issue that—at the time of briefing—hadn't been decided by the Sixth Circuit or any district court in this Circuit. (*See* dkts. 15, 21, 24.) The motion to dismiss phase was further complicated by the Supreme Court's

intervening decision on Article III standing in *Spokeo*, which prompted the Court to request supplemental briefing on the emerging and complex issue. (Dkt. 27.) Put simply, each of these issues required Class Counsel to form novel legal arguments based on new authority that did not exist at the time of filing. (*See* dkts. 21, 29.) While plaintiff and Class Counsel prevailed on both of these issues, TV Guide has made clear that, but for the Settlement, it would continue to assert other complex and novel legal issues, including the constitutionality of the PPPA. (*See* Scharg Decl. ¶¶ 21, 23.)

In the end, because this case involved complex factual and legal questions under the PPPA, the complexity of the litigation further supports the reasonableness of the requested fees. *See In re Cardizem*, 218 F.R.D. at 534 (approving fee request where "[p]laintiffs' [c]ounsel, from the very beginning of this litigation, demonstrated a thorough understanding of the case, the industry, [d]efendants' business operations, and effectively and efficiently prosecuted and settled this matter").

### 5.    *The Parties are both represented by skilled counsel.*

The skill and standing of counsel on both sides, including their experience and professionalism, also validates the reasonableness of a requested fee award. *In re Rio*, 1996 WL 780512, at *18. In cases where counsel for both parties have significant experience, courts have found that "the ability of [counsel] to negotiate

24

a favorable settlement in the face of formidable legal opposition further evidences the reasonableness of the fee award requested." *In re Delphi*, 248 F.R.D. at 504.

Class Counsel are well-respected members of the legal community with significant experience litigating consumer class actions of similar size, scope, and complexity. (Scharg Decl. ¶ 22.) (*See also* Edelson PC Firm Resume, attached as Exhibit 2-A.) In addition to being at the forefront of PPPA litigation, *see*, *e.g.*, *Halaburda*, No. 12-cv-12831, dkt. 68, Edelson PC is widely known for its work in the area of consumer privacy litigation. *See, e.g.*, *Spokeo*, 136 S. Ct. 1540 (2016); *In re Facebook Privacy Litig.*, No. 10-cv-02389, dkt. 69 at 5 (N.D. Cal. 2010) (recognizing Edelson PC as "pioneers in the electronic privacy class action field"); *see also In re Netflix Privacy Litig.*, No. 11-cv-00379, dkt. 59 (N.D. Cal. Aug. 12, 2011) (noting Edelson PC's "significant and particularly specialized expertise in electronic privacy litigation and class actions"); *see also Harris v. comScore*, No. 11-cv-05807, dkt. 369 (N.D. Ill. 2014) (granting final approval to one of the largest consumer class actions ever brought under federal electronic privacy laws, in which Edelson PC served as sole lead counsel).

Class Counsel also faced formidable defense counsel in this action, litigating against attorneys from the notable defense firms Winget, Spadafora & Schwartzberg, LLP and Traub Lieberman Straus & Shrewsberry LLP. (Scharg Decl. ¶ 23.) Defense counsel has significant experience in defending privacy

related disputes and, unsurprisingly, has at all times vigorously defended TV Guide throughout this litigation. (*Id.*) Indeed, opposing counsel has made clear that, if the litigation were to continue, they would continue to dispute Defendant's liability, assert multiple defenses, and even challenge the constitutionality of the PPPA itself through appeal. (*Id.*)

Given the skill and standing of counsel on both sides, the reasonableness of the requested fee award is apparent.

### 6.   *The value of the legal services performed on an hourly basis is reasonable.*

The sixth and final factor assesses the value of the legal services performed on an hourly basis. *In re Cardizem,* 218 F.R.D. at 533. The value of the legal services performed essentially amounts to a lodestar, which involves multiplying the number of hours counsel reasonably expended on the matter by their reasonable hourly rate. *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).[4] A good-faith effort must be made to exclude hours that are excessive or otherwise unnecessary.

---

[4]     Although this factor may be viewed as a lodestar cross-check, *see Kogan*, 193 F.R.D. at 504, a cross-check is entirely optional. *See Van Horn v. Nationwide Property & Cas. Ins. Co.*, 436 F. App'x 496, 501 (6th Cir. 2011) (finding that district courts have complete discretion when deciding to calculate attorneys' fees based on the percentage-of-the-fund or lodestar methods, and thus a cross-check analysis is optional.)

*Hensley,* 461 U.S. at 434; *Brian A. v. Hattaway*, 83 F. App'x 692, 695 (6th Cir. 2003).

To date, Class Counsel have expended 1,133 hours litigating this case. (Scharg Decl. ¶ 24.) The value of Class Counsel's services at their current hourly rates amounts to $436,815.00.[5] (*Id.* ¶ 25.) Therefore, the value of the time spent litigating this case and securing the Settlement, including reimbursable expenses of $6,465.55, totals $443,280.55. (*Id.*)[6]

Further, the Court has discretion to increase the base value of Class Counsel's services based on certain factors, known as a "multiplier." *Van Horn*, at 499-500 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)). Salient factors include the results achieved, the risk of not prevailing in the action, the skill and experience of the attorneys, and awards in similar cases. *See Geier v. Sundquist*, 372 F.3d 784, 793 (6th Cir. 2004); *see also*

---

[5]    Numerous courts have readily approved Class Counsel's rates in similar consumer class action litigation. *See, e.g., Gross v. Symantec Corp.*, No. 12-cv-00154, dkt. 88 (N.D. Cal. Mar. 21, 2014) (noting that Edelson PC's current "hourly rates are reasonable and have previously been approved by other courts throughout the country"); *Kulesa v. PC Cleaner*, No. 12-cv-0725, dkt. 101, at 16–17 (C.D. Cal. Aug. 26, 2014) (explicitly finding Edelson PC's lodestar reasonable and awarding enhanced lodestar).

[6]    This figure does not include the additional $20,000 to $40,000 in fees that Class Counsel will likely incur in connection with proceeding through final approval of the Settlement and the claims administration process, and addressing any potential objections. (Scharg Decl. ¶ 25.)

*Van Horn*, 436 F. App'x at 500.[7] Typical multipliers in this Circuit range from two

to five, *see Connectivity Sys. Inc. v. Nat'l City Bank*, 2011 WL 292008, at *13

(S.D. Ohio Jan. 26, 2011), but have reached as high as 10 in appropriate cases, *see*

*Manners v. Am. Gen. Life Ins. Co.*, 1999 WL 33581944, at *31 (M.D. Tenn. Aug.

11, 1999). Just as the results, risk, and skill of counsel support the reasonableness

of the requested fees under the percentage method, they also justify a multiplier of

the base value of Class Counsel's services.

Here, the requested fee of $595,000 represents a multiplier of between 1.2

and 1.3 (depending on the amount of work going forward), which falls on the low

end of the range of multipliers that are typically approved in this District and

Circuit, including in other PPPA cases. *See, e.g., Moeller*, No. 5:16-cv-11367, dkt.

37 at 24 (approving a fee request that represented a multiplier of between 4.8 and

4.9); *Perlin*, No. 16-cv-10635, dkt. 53 at 39 (approving a fee request that

represented a multiplier of 3.4); *Kinder*, No. 13-cv-11284, dkt. 77 at 36 (approving

a fee request that represented a multiplier of 2.6). Such a multiplier is more than

justified in this case given the complexity of the litigation, the work performed,

and the outstanding relief secured for the Settlement Class. (Scharg Decl. ¶¶ 16–

25.) *See Merkner v. AK Steel Corp.*, 2011 WL 13202629, at *5 (S.D. Ohio Jan. 10,

---

[7]    These factors closely track the *Ramey* criteria used to assess reasonableness,
discussed in detail above. (*See supra* § III.B.)

2011) (finding multiplier of 5.3 "acceptable under the facts and circumstances of this case" and collecting cases awarding multipliers between 4.5 and 8.74).

Thus, the value of Class Counsel's services on an hourly basis supports the reasonableness of the requested fees here.

### C.    The Requested Incentive Award Reflects Mr. Higgins' Active Involvement in This Action and Should Be Approved.

Incentive awards are frequently awarded in common-fund cases within this Circuit. *See Hadix v. Johnson*, 322 F.3d 895, 897-98 (6th Cir. 2003). The approval of an incentive award is examined through the following factors: (1) the class representative's actions in protecting the class's interests and whether those actions resulted in a substantial benefit to the class; (2) any direct or indirect financial risk the class representative assumed; and (3) the time and effort the class representative dedicated to the action. *Lasalle Town Houses Coop Assoc. v. City of Detroit*, 2016 WL 1223354, at *7 (E.D. Mich. Mar. 29, 2016).

Based on these factors, an incentive award of $5,000 is reasonable. It's equal to the amount awarded to the class representatives in *Halaburda*, No. 12-cv-12831, dkt. 68, *Moeller*, No. 5:16-cv-11367, dkt. 42, and *Perlin*, No. 16-cv-10635, dkt. 55, and half the amount awarded in *Kinder*, No. 13-cv-11284, dkt. 81. It's also a fraction of amounts often awarded in comparable settlements. *See, e.g.*, *In re CMS Energy ERISA Litig.*, 2006 WL 2109499, at *3 (E.D. Mich. June 27, 2006) (awarding three class representatives $15,000 each for contributions to the case,

including providing information to class counsel, reviewing documents, assisting with discovery, and participating in settlement discussions).

That said, the Sixth Circuit continues to express concern that incentive awards unjustly disproportionate to the named plaintiff's work and effort can create an incentive to act against the class's best interests. *See In re Pampers Dry Max Litig.*, 724 F.3d 713, 718 (6th Cir. 2013). But this problem is most acute where paltry settlements are made functionally unavailable to a class, or where a settlement contains no common fund at all. *See, e.g., id.* at 716-17 (denying an incentive award where unnamed class members could not opt out of the settlement, and the likelihood of class members actually being able to take advantage of the monetary or injunctive relief was highly unlikely); *Hadix*, 322 F.3d at 898 (describing it as "plainly inappropriate" to grant an incentive award without a common fund). To avoid situations where a named plaintiff's receipt of a "bounty" acts as a disincentive for the class representative to act fairly, "[class] counsel must provide the district court with specific documentation . . . of the time actually spent on the case by each recipient of an award" so that the court can be sure that the award is designed as compensation, not a windfall. *Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 311 (6th Cir. 2016).

As documented in his declaration, Mr. Higgins spent approximately 7 hours protecting and advancing the interests of the class through his involvement in this

case. (Declaration of Tom Higgins ["Higgins Decl."], ¶ 9, attached hereto as Exhibit 3.) Mr. Higgins became actively involved in the litigation shortly after the former named plaintiff—Shirley Hyman—suffered a severe health issue which rendered her unable to continue serving as the class representative. (Scharg Decl. ¶¶ 10–11.) Having PPPA claims virtually identical to Ms. Hyman's, Mr. Higgins willingly stepped up to represent the class as the lead plaintiff at a crucial juncture in the case. (*Id.* ¶¶ 11, 30.) Had he not done so, the relief secured for the Settlement Class wouldn't have been possible. (*Id.* ¶¶ 26, 30.)

Upon entering the case, Mr. Higgins assisted Class Counsel in preparing the First Amended Class Action Complaint, (dkt. 64), by detailing his magazine subscription history, carefully reviewing the amended complaint for accuracy, and giving his approval before filing. (Higgins Decl. ¶ 3.) Further, since the parties were engaged in discovery when he entered the case, Mr. Higgins preserved any documents related to his *TV Guide Magazine* subscription that would potentially need to be turned over to TV Guide in discovery and worked with Class Counsel to schedule his deposition, though the Parties reached a settlement before one was necessary. (*Id.* ¶ 4.) Plaintiff Higgins also actively conferred with counsel via telephone multiples times throughout the litigation of his claims, including during discovery and the settlement process. (*Id.* ¶ 5.) As a direct result of his participation, Class Counsel was able to secure the prospective and monetary relief

for the class, which is readily available for class members to take advantage of, as evidenced by the thousands of Claim Forms already submitted. His $5,000 incentive payment is not a "bounty" and should be approved.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court (1) approve attorneys' fees in the amount of $595,000, (2) grant Mr. Higgins an incentive award of $5,000 in recognition of his efforts on behalf of the class, and (3) award such other and further relief as the Court deems reasonable and just.[8]

Respectfully submitted,

Dated: November 9, 2018

**TOM HIGGINS**, individually and on behalf of the settlement class

By: /s/ Ari J. Scharg
        One of Plaintiff's attorneys

Ari J. Scharg
ascharg@edelson.com
Schuyler R. Ufkes
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

---

[8]    Plaintiff will submit a single proposed order relating to his request for attorneys' fees, expenses, and an incentive award and his request for final approval of the Settlement when he files his motion for final approval.

Eve-Lynn J. Rapp
erapp@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Henry M. Scharg
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: (248) 596.1111
Fax: (248) 671.0335

*Settlement Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, Ari J. Scharg, an attorney, hereby certify that on November 9, 2018, I served the above and foregoing ***Plaintiff's Motion for and Brief in Support of Attorneys' Fees, Expenses, and Incentive Award*** on all counsel of record by filing it electronically with the Clerk of the Court using the CM/ECF filing system.

/s/ Ari J. Scharg_____

34