## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TOM HIGGINS, individually and on behalf of the settlement class, | Case No.: 2:15-cv-13769 |
| Plaintiff, | Hon. Stephen J. Murphy, III |
| v. | Mag. Mona K. Majzoub |
| TV GUIDE MAGAZINE, LLC, a Delaware limited liability company, | |
| Defendant. | |

## PLAINTIFF'S MOTION FOR AND BRIEF IN SUPPORT OF
## FINAL APPROVAL OF CLASS ACTION SETTLEMENT

**Respectfully submitted by:**

Ari J. Scharg
ascharg@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
Schuyler R. Ufkes
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Eve-Lynn J. Rapp
erapp@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Henry M. Scharg
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: (248) 596-1111
Fax: (248) 671-0335

*Settlement Class Counsel*

**PLAINTIFF'S MOTION FOR**
<u>**FINAL APPROVAL OF CLASS ACTION SETTLEMENT**</u>

Plaintiff Tom Higgins respectfully moves the Court to grant his Motion for Final Approval of Class Action Settlement. Specifically, Plaintiff requests that the Court find that (i) the notice to the Settlement Class satisfies the requirements of Due Process and Federal Rule of Civil Procedure 23, and (ii) the Settlement is fair, reasonable, and adequate meriting final approval. In accordance with Local Rule 7.1(a), Plaintiff conferred with counsel for Defendant TV Guide Magazine, LLC on December 5, 2018. Defendant will not oppose the relief sought by this Motion.

For the reasons discussed in the accompanying brief, the Motion should be granted.

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR
<u>FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>**

**STATEMENT OF ISSUES PRESENTED**

1. Whether this Court should find that notice to the Settlement Class satisfies the requirements of Due Process and Federal Rule of Civil Procedure 23, when direct notice, detailing the terms of the Settlement Agreement and individual options for objecting, opting-out, or submitting a claim, was transmitted via postcard and reached approximately 90% of the Settlement Class?

**Plaintiff's Answer: Yes.**

2. Whether this Court should grant final approval to the Settlement Agreement under Michigan's Preservation of Personal Privacy Act, M.C.L. § 445.1711-15 ("PPPA") finding it fair, reasonable, and adequate, when it delivers meaningful prospective and monetary relief to the Settlement Class?

**Plaintiff's Answer: Yes.**

## **CONTROLLING AND MOST IMPORTANT AUTHORITY**

**UNITED STATES SUPREME COURT CASES:**

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)

**UNITED STATES COURT OF APPEALS CASES:**

*Pelzer v. Vassalle*,
    655 F. App'x 352 (6th Cir. 2016)

*UAW v. Gen. Motors Corp.*,
    497 F.3d 615 (6th Cir. 2007)

**UNITED STATES DISTRICT COURT CASES:**

*Halaburda v. Bauer Publ'g Co.*,
    No. 12-cv-12831 (E.D. Mich. 2015)

*Kinder v. Meredith Corp.*,
    No. 13-cv-11284 (E.D. Mich. May 18, 2016)

*Leonhardt v. ArvinMeritor, Inc.*,
    581 F. Supp. 2d 818 (E.D. Mich. 2008)

*Perlin v. Time Inc.*,
    No. 2:16-cv-10635 (E.D. Mich. Oct. 15, 2018)

**OTHER AUTHORITIES:**

Fed. Judicial Ctr., Judges' Class Action Notice and Claims Process
    Checklist and Plain Language Guide (2010)

Fed. R. Civ. P. 23

# TABLE OF CONTENTS

I.  INTRODUCTION ......................................................................... 1

II. SUMMARY OF THE LITIGATION ...................................... 4

    A.  Plaintiff's Allegations and the PPPA ................................. 4

    B.  The Road to the Settlement Agreement ........................... 6

III. TERMS OF THE SETTLEMENT AGREEMENT ................ 10

    A.  Class Definition................................................................ 10

    B.  Monetary Relief ............................................................... 10

    C.  Prospective Relief ............................................................ 11

    D.  Payment of Notice and Settlement Administration
        Expenses ........................................................................... 11

    E.  Payment of Incentive Award, Attorneys' Fees,
        and Expenses.................................................................... 11

    F.  Release ............................................................................. 12

IV. THE NOTICE PLAN COMPORTS WITH DUE PROCESS ............... 12

V.  THE SETTLEMENT WARRANTS FINAL APPROVAL .................... 15

    A.  Plaintiff Higgins and Class Counsel Have Adequately
        Represented the Settlement Class .................................... 16

    B.  The Settlement Was Negotiated at Arm's Length and Is Free
        from Fraud and Collusion ................................................ 19

    C.  The Settlement Treats All Settlement Class Members
        Equally............................................................................. 21

**D.**   **The Relief Secured for the Settlement Class is Adequate and Warrants Final Approval** ................................................................. 22

   **1.**   ***The Cost, Risk, and Delay of Further Litigation Compared to the Settlement's Benefits Favors Final Approval*** .............. 23

   **2.**   ***The Method of Distributing Relief to the Settlement Class Members Is Effective and Supports Final Approval*** ............ 29

   **3.**   ***The Terms of the Requested Attorneys' Fees Are Reasonable*** ......................................................................... 32

   **4.**   ***There Are No Agreements Outside the Settlement To Be Identified*** .................................................................. 33

**VI.**   **CONCLUSION** ........................................................................... 34

# TABLE OF AUTHORITIES

## United States Supreme Court Cases

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ................................................................. 12

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) ................................................................. 21

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)............................................................. 7, 25

## United States Appellate Court Cases

*Coulter-Owens v. Time, Inc.*,
    695 F. App'x 117 (6th Cir. 2017)................................................ 24

*Fidel v. Farley*,
    534 F.3d 508 (6th Cir. 2008) ................................................... 13

*Gascho v. Glob. Fitness Holdings, LLC*,
    822 F.3d 269 (6th Cir. 2016) ........................................... 13, 20, 31

*Granada Invs., Inc. v. DWG Corp.*,
    962 F.2d 1203 (6th Cir. 1992) ................................................. 15

*In re Pampers Dry Max Litig.*,
    724 F.3d 713 (6th Cir. 2013) ................................................... 22

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) ........................................... 3, 27, 28

*Parker v. Time Warner Entm't Co., L.P.*,
    331 F.3d 13 (2d Cir. 2003) ...................................................... 26

*Pelzer v. Vassalle*,
    655 F. App'x 352 (6th Cir. 2016)................................................ 33

*UAW v. Gen. Motors Corp.*,
497 F.3d 615 (6th Cir. 2007) ................................................................ *passim*

*Vassalle v. Midland Funding LLC*,
708 F.3d 747 (6th Cir. 2013) ...................................................... 21

**United States District Court Cases**

*Coulter-Owens v. Rodale*,
No. 14-cv-12688 (E.D. Mich. Sept. 29, 2016) ......................................... 2, 27

*Coulter-Owens v. Time Inc.*,
2016 WL 612690 (E.D. Mich.)........................................................ 24

*Coulter-Owens v. Time, Inc.*,
308 F.R.D. 524 (E.D. Mich. 2015) ......................................... 24, 25

*Dick v. Sprint Commc'ns Co. L.P.*,
297 F.R.D. 283 (W.D. Ky. 2014) ......................................... 12, 19

*Fraley v. Facebook, Inc.*,
966 F. Supp. 2d 939 (N.D. Cal. 2013)........................................ 3, 4

*Halaburda v. Bauer Publ'g Co, LP*,
2:12-cv-12831 (E.D. Mich.) ............................................. 3, 27, 28

*Halliday v. Weltman, Weinber & Reis Co., L.P.A.*,
2013 WL 692856 (E.D. Mich. Feb. 26, 2013)............................................. 15

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
2009 WL 5184352 (W.D. Ky. Dec. 22, 2009) ............................................. 13

*In re Google Buzz Privacy Litig.*,
2011 WL 7460099 (N.D. Cal. Jun. 2, 2011) ............................................. 3, 28

*In re LivingSocial Mktg. & Sales Practice Litig.*,
298 F.R.D. 1, 22 (D.D.C. 2013) ................................................... 33

*In re Netflix Privacy Litig.*,
    2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ......................................... 3, 28

*In re Telectronics Pacing Sys., Inc.*,
    137 F. Supp. 2d 985 (S.D. Ohio 2001) ......................................................... 24

*In re: Whirlpool Corp. Front–loading Washer Prod. Liab. Litig.*,
    2016 WL 5338012 (N.D. Ohio Sept. 23, 2016) .................................... 29, 33

*IUE-CWA v. Gen. Motors Corp.*,
    238 F.R.D. 583 (E.D. Mich. 2006) ........................................................ 16, 19

*Kinder v. Meredith Corp.*,
    1:14-cv-11284 (E.D. Mich.) ............................................................. 2, 27, 32

*Kogan v. AIMCO Fox Chase, L.P.*,
    193 F.R.D. 496 (E.D. Mich. 2000) .............................................................. 19

*Leonhardt v. ArvinMeritor, Inc.*,
    581 F. Supp. 2d 818 (E.D. Mich. 2008) ................................................ *passim*

*Moeller v. Am. Media, Inc.*,
    No. 5:16-cv-11367 (E.D. Mich. Jun. 8, 2017) .................................... 3, 27, 32

*Perlin v. Time Inc.*,
    No. 2:16-cv-10635 (E.D. Mich. Oct. 15, 2018) ...................................... *passim*

*Sheick v. Auto. Component Carrier, LLC*,
    2010 WL 3070130 (E.D. Mich. Aug. 2, 2010) ............................................. 19

*Snyder v. Ocwen Loan Servicing, LLC*,
    2018 WL 4659274 (N.D. Ill. Sept. 28, 2018) ........................................ 17, 24

**Statutory Provisions**

28 U.S.C. § 1332 ................................................................................................ 6

28 U.S.C. § 1715 ...................................................................................... *passim*

Fed. R. Civ. P. 23 ..................................................................................... *passim*

M.C.L. § 445 ................................................................................*passim*

**Other Authorities**

Fed. Judicial Ctr., Judges' Class Action Notice and Claims Process
      Checklist and Plain Language Guide (2010) ................................................ 13

*Privacy: Sales, Rentals of Videos, etc.*,
      House Legislative Analysis Section, H.B. 5331, Jan. 20, 1989 ................ 5, 6

I.    INTRODUCTION

On September 18, 2018 this Court preliminarily approved the proposed

Class Action Settlement Agreement between Plaintiff Tom Higgins ("Plaintiff" or

"Higgins") and Defendant TV Guide Magazine, LLC ("Defendant" or "TV

Guide") (together, the "Parties") and directed that notice be sent to the Settlement

Class.[1] (Dkt. 73.) The Settlement Administrator has implemented the Court-

approved notice plan, and direct notice has reached approximately 90% of the

Settlement Class. The reaction to the Settlement has been overwhelmingly

positive: of the approximately 90,000 members of the Settlement Class, not a

single one objected to the Settlement, only six (or 0.007%) have requested to be

excluded, and more than 15% of the class have already submitted claims for

payment. Given the complete lack of opposition to the Settlement's terms and the

overwhelmingly positive response from the Settlement Class, the Court should

have no hesitation in granting final approval to the Settlement.

The Settlement's strength largely speaks for itself: it creates a $1.7 million

non-reversionary common fund from which Settlement Class Members' claims,

notice and administrative expenses, Court-awarded attorneys' fees, and an

---

[1]     A copy of the Parties' Class Action Settlement Agreement ("Settlement" or
"Agreement") is attached hereto as Exhibit 1. Except as otherwise indicated, all
defined terms used herein shall have the same meanings ascribed to them in the
Parties' proposed Settlement Agreement.

incentive award to the Class Representative will be paid. In terms of individual relief, each Settlement Class Member that submits a short and simple Claim Form (either in hard-copy or online), will receive an estimated cash payment of $60–80. And, just as important, the Settlement delivers strong prospective relief by requiring Defendant to stop disclosing its Michigan customers' personal reading information to third party companies for a period of four years. Put simply, the Settlement achieves the paramount goals of this lawsuit: providing monetary relief to the class for their PPPA claims and stopping the unauthorized disclosure of their magazine preferences.

Ultimately, while the strength of the Settlement should be apparent on its face, the Court need not evaluate the Settlement in a vacuum. Indeed, a review of previous PPPA settlements in this District demonstrates that the Settlement compares favorably to those previously approved by the court. *See, e.g.*, *Coulter-Owens v. Rodale*, No. 14-cv-12688, dkt. 54 (E.D. Mich. Sept. 29, 2016) (securing a $4.5 million fund for a class of approximately 580,000 magazine subscribers with claiming class members receiving a *pro rata* payment of approximately $44); *Kinder v. Meredith Corp.*, No. 13-cv-11284, dkt. 81 (E.D. Mich. May 18, 2016) (securing a $7.5 million fund for a class of approximately 980,000 magazine subscribers with claiming class members receiving a *pro rata* payment of approximately $50); *Perlin v. Time Inc.*, 2:16-cv-10635, dkt. 55 (E.D. Mich. Oct.

15, 2018) (securing a $7.4 million fund for a class of approximately 600,000 magazine subscribers under PPPA with claiming class members receiving an estimated $50); *Halaburda v. Bauer Publ'g Co.*, No. 12-cv-12831, dkt. 68 (E.D. Mich. Jan. 6, 2015) (securing a $775,000 fund for a class of 40,000 magazine subscribers with claiming class members receiving a *pro rata* payment of approximately $74); *Moeller v. Am. Media, Inc.*, No. 5:16-cv-11367, dkt. 42 (E.D. Mich. Jun. 8, 2017) (securing a $7.6 million fund for a class of 415,000 magazine subscribers with claiming class members receiving an estimated $100).

And when compared to approved settlements of cases alleging violations of similar privacy statutes with statutory damage awards—which typically offer no monetary relief to the class whatsoever—the fairness, reasonableness, and adequacy of the instant Settlement becomes even more apparent. *See, e.g.*, *Lane v. Facebook, Inc.*, 696 F.3d 811, 820–22 (9th Cir. 2012) *cert. denied*, 571 U.S. 1003 (2013) (approving a settlement of federal Video Privacy Protection Act ["VPPA"] claims, and directing $9.5 million to *cy pres* as the sole form of monetary relief); *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6-7 (N.D. Cal. Mar. 18, 2013) (approving $9 million *cy pres* settlement of VPPA claims); *In re Google Buzz Privacy Litig.*, 2011 WL 7460099, at *3 (N.D. Cal. Jun. 2, 2011) (approving $8.5 million *cy pres* settlement); *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939 (N.D.

3

Cal. 2013) (approving privacy settlement providing claimants with a cash payment of $15).

For these reasons, and those discussed further below, Plaintiff respectfully requests that the Court grant final approval to the Parties' proposed Class Action Settlement Agreement.

## II.   SUMMARY OF THE LITIGATION

Plaintiff's allegations, the litigation history, and the events leading up to the Settlement provide context for its fairness, reasonableness, and adequacy.

### A.   Plaintiff's Allegations and the PPPA.

Defendant TV Guide Magazine is an American magazine publisher who publishes the widely popular titles *TV Guide Magazine* and *TV Weekly*. (*See* dkt. 64, Plaintiff's First Amended Class Action Complaint ["FAC"] ¶ 1.) Plaintiff alleges that TV Guide doesn't just make money selling magazines and advertising space—it makes additional profit by selling its subscribers' personal choices in reading material. (*Id.* ¶¶ 2, 22, 24–26, 51–53, 60.) And instead of simply selling lists of names that subscribe to certain magazines, Plaintiff alleges that TV Guide offers for sale something far more valuable: customers' magazine reading choices along with additional data about their income level, religion, age, race, political affiliations, travel habits, medical conditions, and other sensitive, personal information. (*Id.* ¶¶ 2, 19, 22, 26, 34–35, 37, 60.) TV Guide allegedly obtains this

demographic and lifestyle data about its customers from data miners and other third parties by offering its subscriber lists in exchange for the supplemental demographic data. (*Id.*)

Of course, none of this is illegal if a magazine publisher informs its subscribers about what it is doing and gets consent to disclose the information. *See* M.C.L. § 445.1713. The problem is, Plaintiff alleges, TV Guide's subscribers never provided consent for TV Guide to disclose information to third parties related to their magazine subscriptions. (*Id.* ¶¶ 3, 27, 32–38, 56, 57.)

This case was initiated on October 26, 2015, (dkt. 1), and Plaintiff Tom Higgins filed an Amended Class Action Complaint on June 5, 2018. (Dkt. 64.) Higgins alleges that at no time did he consent to allow TV Guide to disclose his choice of magazine subscription to any third parties, but Defendant disclosed that information anyway. (FAC ¶¶ 32–35.) He further alleges that this conduct violates the PPPA, which prohibits retailers, publishers, and other entities engaged in the business of selling written materials at retail from disclosing records or information concerning the purchase of those materials by a customer that indicates the identity of the customer. M.C.L. § 445.1712. The Michigan legislature rightfully recognized that a person's choice in reading materials "is nobody's business but one's own," and passed the PPPA "to explicitly protect a consumer's privacy in buying and borrowing" such materials. *Privacy: Sales, Rentals of Videos, etc.*,

House Legislative Analysis Section, H.B. 5331, Jan. 20, 1989. Given the importance of reader privacy, the version of the PPPA at issue here (i.e., the version that existed prior to the Michigan Legislature's 2016 amendments) provides for statutory damages of $5,000 per violation. (*See* dkt. 41 at 5.)

### B. The Road to the Settlement Agreement.

Since this case was filed, TV Guide has mounted a vigorous defense. Defendant's initial attack came when it moved to dismiss, arguing that the Court lacked subject matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because diversity of citizenship was lacking between it and the putative class of Michigan residents and because CAFA's $5 million jurisdictional minimum could not be met due to a proposed amendment to the PPPA that, according to TV Guide, would bar recovery of the statute's $5,000 liquidated damages. (Dkts. 9, 13, 15.) Shortly thereafter, Defendant filed a motion to stay class discovery pending adjudication of its motion to dismiss and the enactment of the proposed amendment to the PPPA. (Dkt. 11.)

The parties then entered into a stipulation permitting former plaintiff Shirley Hyman to conduct discovery on the jurisdictional issues raised by Defendant's motion to dismiss, namely the citizenship of Defendant's LLC members and the location of its "nerve center." (Dkt. 19.) Pursuant to that agreement, Defendant produced hundreds of documents in response to plaintiff Hyman's written

6

discovery requests and produced two of its officers for depositions. (Declaration of Ari J. Scharg in Support of Plaintiff's Motion for Final Approval of Class Action Settlement ["Scharg Decl."], attached hereto as Exhibit 2, ¶ 5.) Class Counsel thoroughly reviewed the produced documents and, on June 16, 2016, deposed TV Guide's witnesses in New York City. (*Id*.)

Following the completion of jurisdictional discovery, plaintiff Hyman filed an opposition to Defendant's motions to stay and dismiss, asserting that the PPPA amendment only applies prospectively to claims that, unlike plaintiff's, accrued after its July 2016 effective date. (*See* dkts. 21, 24.) Shortly thereafter, the Court requested supplemental briefing from the parties addressing the effect, if any, of the Supreme Court's then-recent decision on Article III standing in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). (Dkt. 27.) When requested, the question of whether *Spokeo* stripped plaintiff Hyman of Article III standing was a complex issue of first impression, which plaintiff thoroughly briefed. (Dkt. 29.) Specifically, plaintiff Hyman explained that *Spokeo* actually confirmed that she has Article III standing because TV Guide's undisputed disclosure of her personal reading choices was an invasion of her legally protected privacy interest. (*Id*.) Before ruling on the motion to dismiss, on August 22, 2016, the Court stayed the case pending the Sixth Circuit's decision in *Coulter-Owens v. Time Inc.*, Nos. 16-1321 & 16-1380, where the appellate court was considering, in light of *Spokeo* and the

2016 amendments to the PPPA, whether an alleged PPPA violation provides Article III standing and applied retroactively. (Dkt. 32.) After the Sixth Circuit issued its decision in *Coulter-Owens*, the Court lifted the stay, (dkt. 38), and denied Defendant's motion to dismiss in its entirety (dkt. 41). Defendant thereafter answered the complaint by denying the allegations and raising 18 affirmative defenses, including that TV Guide does not sell magazines "at retail" and that the statutory damages sought violate TV Guide's Due Process rights. (Dkt. 43.)

With the pleadings settled, Hyman and Defendant exchanged initial disclosures and began discovery. (Scharg Decl. ¶ 6.) Hyman then served subpoenas on five third-party vendors, including Wiland Direct, Epsilon Data Management, and I-Behavior, to obtain documents and deposition testimony from five entities to whom she believed, based on Defendant's written discovery responses, TV Guide disclosed subscriber information to. (*Id.* ¶ 7.) Over the next eight months, the parties engaged in substantial class- and merits-related discovery, which included the production and review of thousands of pages of documents, numerous meet-and-confer conferences, and expert review of various transmission and data logs produced by the five third-party vendors. (*Id.* ¶ 8.) Throughout discovery, the parties discussed the possibility of resolution and kept lines of communication open regarding settlement. (*Id.* ¶ 9.)

Unfortunately, towards the end of the discovery period, plaintiff Hyman suffered a severe health issue which rendered her unable to continue serving as the class representative. (*Id.* ¶ 10.) As a result, Class Counsel and Defendant's counsel met and conferred on this matter and Defendant agreed to allow another class member—Tom Higgins, a Michigan resident whose claims are virtually identical to Hyman's—to substitute into the case, subject to Court approval. (*Id.* ¶ 11.) The Court granted the Parties' jointly filed motion to substitute Tom Higgins into the case as the lead plaintiff, (dkt. 63), and he filed an amended complaint (dkt. 64).

Higgins then issued amended discovery requests to Defendant, and the Parties scheduled his deposition. (Scharg Decl. ¶ 12.) At that point, the Parties resumed settlement discussions and, per the Court's order, scheduled an in-person private mediation to take place on August 1, 2018 in an effort to resolve the case without the expense of further litigation, which would necessarily include adversarial class certification and summary judgment briefing. (*Id.* ¶ 13; *see* dkt. 66.) After multiple rounds of arm's-length negotiations in the weeks leading up to mediation, the Parties were able to reach agreement on the principal terms of the Settlement. (Scharg Decl. ¶ 14.) The Parties then diligently prepared and executed the written Settlement Agreement, which the Court preliminarily approved on September 18, 2018. (*Id.* ¶ 15; dkt. 73.)

### III.   TERMS OF THE SETTLEMENT AGREEMENT

The terms of the Settlement Agreement are briefly summarized as follows:

### A.   Class Definition

As part of preliminary approval, the Court certified a Settlement Class defined as "all persons with Michigan street addresses who purchased a subscription to *TV Guide Magazine* or *TV Weekly* from TV Guide between October 26, 2009 and October 26, 2015."[2] (Dkt. 73 at 7.)

### B.   Monetary Relief

Defendant has established a $1.7 million non-reversionary Settlement Fund, from which each Settlement Class Member who submits a valid claim shall be entitled to a *pro rata* share, after payment of notice and administrative expenses, attorneys' fees, and any incentive award to the Class Representative. (Agreement ¶¶ 1.31, 2.1.) Individual payments are estimated to be approximately $60–80. (Scharg Decl. ¶ 17.)

---

[2]   Excluded from the Settlement Class are (1) any Judge or Magistrate presiding over this Action and members of their families; (2) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and their current or former officers, directors, agents, attorneys, and employees; (3) persons who properly execute and file a timely request for exclusion from the Settlement Class; and (4) the legal representatives, successors or assigns of any such excluded persons. (Agreement ¶ 1.29.)

### C.     Prospective Relief

For a period of four years from September 18, 2018 (the date the Court entered its Preliminary Approval Order), and in accordance with the Settlement Agreement, Defendant will not disclose any Michigan customers' subscription information to third-party companies without their prior express written consent. (Agreement ¶ 2.2.)

### D.     Payment of Notice and Settlement Administration Expenses

Defendant has paid, and will continue to pay, all notice and Settlement Administration Expenses out of the Settlement Fund. (*Id.* ¶¶ 1.27, 1.31.) To date, Settlement Administration Expenses, including the cost of notice, have totaled $63,789.54. (Declaration of Joseph F. Mahan ["Mahan Decl."] ¶ 18, attached hereto as Exhibit 3.)

### E.     Payment of Incentive Award, Attorneys' Fees, and Expenses

Defendant has agreed to pay an incentive award from the Settlement Fund to Plaintiff Higgins in the amount of $5,000 to compensate him for his service as Class Representative, as well as reasonable attorneys' fees not to exceed 35% of the Settlement Fund. (Agreement ¶¶ 1.31, 8.1, 8.3.) Both awards are subject to the Court's approval, which Plaintiff has petitioned for separately. (*See* dkt. 75.)

### F.     Release

In exchange for the relief described above, Defendant and each of its related and affiliated entities will receive a full release of all claims arising out of or related to Defendant's disclosure of its Michigan customers' magazine subscription information. (*See* Agreement ¶¶ 1.24–1.26 for full release language.)

## IV.   THE NOTICE PLAN COMPORTS WITH DUE PROCESS.

Before final approval can be granted, Due Process and Rule 23 require that the notice provided to the Settlement Class is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). The recently amended Rule 23 instructs litigants to provide notice to the class via "United States mail, electronic means, or other appropriate means." Fed. R. Civ. P. 23(c)(2)(B) (eff. Dec. 1, 2018). The notice "must clearly and concisely state in plain, easily understood language" essential information regarding the settlement, including the nature of the action, terms of the settlement, and class members' options. *See id.*; *Dick v. Sprint Commc'ns Co. L.P.*, 297 F.R.D. 283, 292 (W.D. Ky. 2014). At its core, "[a]ll that the notice must do is fairly apprise the prospective members of the class of the terms of the proposed settlement so that class members may come to their own conclusions about whether the settlement serves their interest." *UAW v. Gen.*

*Motors Corp.*, 497 F.3d 615, 630 (6th Cir. 2007) (citation omitted).

That said, Due Process does not require that every class member receive notice, and a notice plan is reasonable if it reaches at least 70% of the class. *Fidel v. Farley*, 534 F.3d 508, 514 (6th Cir. 2008); Fed. Judicial Ctr., Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide 3 (2010); *see also In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2009 WL 5184352, at *12 (W.D. Ky. Dec. 22, 2009) (finding notice plan to be "the best notice practicable" where combination of mail and publications notice reached 81.8% of the class); *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 289 (6th Cir. 2016) (finding that notice and claims processes were appropriate where 90.8% of notices were successfully delivered to addresses associated with class members). The notice plan here easily satisfies these standards, as it provided direct notice via a postcard to approximately 90% of the Settlement Class.

At preliminary approval, the Court approved the Parties' proposed Notice Plan, finding it met the requirements of Rule 23 and Due Process. (Dkt. 73 at 6.) That plan has now been fully carried out by professional settlement administrator Heffler Claims Group LLC ("Heffler"). Pursuant to the Settlement, Defendant provided Class Counsel and Heffler with a list of 103,187 available names and addresses of potential members of the Settlement Class. (Agreement ¶ 4.1(a)); Mahan Decl. ¶ 5.) After taking into account business subscribers that are not

13

included in the Settlement Class, Class Counsel estimates that there are

approximately 90,000 members of the Settlement Class.[3] (Scharg Decl. ¶ 16.) To

ensure comprehensive notice, Heffler sent the Court-approved notice via postcard

to all 103,187 unique addresses on the class list. (Mahan Decl. ¶ 11.) Of those

postcards, 216 were returned with a forwarding address and resent, and 11,369

were identified as undeliverable as addressed. (*Id.* ¶¶ 12–13.) Accordingly, direct

notice of the Settlement was successfully delivered to approximately 90% of the

Settlement Class. (*Id.* ¶¶ 11–13.)[4] These summary notices also directed members

of the Settlement Class to a Settlement Website, www.tvguidesettlement.com,

where they were able to submit claims online; access important court filings,

including the Motion for Attorneys' Fees, (dkt. 75); and see deadlines and answers

to frequently asked questions. (Agreement ¶ 4.1(d)); (Mahan Decl. ¶¶ 8, 10.)

Given the broad reach of the notice, and the comprehensive information

provided in plain language, the requirements of Due Process and Rule 23 are met.

---

[3]    Business subscribers are not included in the Settlement Class because the PPPA protects personal privacy and thus only provides a private right of action to "individuals" whose magazine subscription information has been disclosed without written permission. *See* M.C.L. § 445.1711-15.

[4]    Heffler also timely notified the appropriate state and federal officials pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715. (Mahan Decl. ¶ 4.)

## V. THE SETTLEMENT WARRANTS FINAL APPROVAL.

The Federal Rules of Civil Procedure require judicial approval of class

action settlements. Fed. R. Civ. P. 23(e); *Halliday v. Weltman, Weinber & Reis*

*Co., L.P.A.*, 2013 WL 692856, at *1 (E.D. Mich. Feb. 26, 2013). At final approval,

the ultimate issue is whether the settlement is fair, reasonable, and adequate. Fed.

R. Civ. P. 23(e)(2). Courts within the Sixth Circuit recognize a strong "federal

policy favoring settlement of class actions." *UAW*, 497 F.3d at 632 (citation

omitted); *see Leonhardt v. ArvinMeritor, Inc.*, 581 F. Supp. 2d 818, 830 (E.D.

Mich. 2008).

To evaluate the fairness, reasonableness, and adequacy of a settlement

agreement at final approval, the recently amended Rule 23(e)(2) directs courts to

consider whether: (1) the class representative and class counsel have adequately

represented the class; (2) the settlement was negotiated at arm's length; (3) the

settlement treats class members equitably relative to each other; and (4) the relief

provided for the class is adequate. Fed. R. Civ. P. 23(e)(2) (eff. Dec. 1, 2018).[5] As

---

[5] Federal Rule of Civil Procedure 23 was recently amended on December 1, 2018 to refine the standards for approval of proposed class action settlements under Rule 23(e)(2). Notably, the factors to be considered under the amended Rule 23 are substantially similar to the "*UAW* factors" previously considered for final settlement approval in the Sixth Circuit. *See UAW*, 497 F.3d at 631 (considering (1) the likelihood of success on the merits; (2) the public interest; (3) the complexity, expense, and duration of future litigation; (4) the opinions of class counsel; (5) the amount of discovery completed; (6) the reaction of absent class members; and (7) the risk of fraud or collusion) (citing *Granada Invs., Inc. v.*

described below, each factor affirms the fairness, reasonableness, and adequacy of the Settlement, and therefore weighs in favor of final approval.

### A. Plaintiff Higgins and Class Counsel Have Adequately Represented the Settlement Class.

The first Rule 23(e)(2) factor considers whether the class representative and class counsel have adequately represented the class. Fed. R. Civ. P. 23(e)(2)(A). The focus of this analysis is "on the actual performance of counsel acting on behalf of the class" throughout the litigation. Fed. R. Civ. P. 23(e) advisory committee's note to 2018 amendment. In considering this factor, courts should examine whether plaintiff and class counsel had adequate information to negotiate a class-wide settlement, taking into account the nature and amount of discovery completed. *Id.* What is imperative is not the amount of *formal* discovery completed, but whether the parties and the court have sufficient information to make a reasoned decision with respect to settlement. *See IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006) ("That the parties conducted their investigation through informal discovery . . . is not unusual or problematic, so long as they and the court have adequate information in order to evaluate the parties' relative positions.").

---

*DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992)); *see also* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment ("The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.").

Ultimately, this factor is generally satisfied where the named plaintiff participated in the case diligently, and where class counsel fought vigorously on behalf of plaintiff and the class throughout the litigation. *See Snyder v. Ocwen Loan Servicing, LLC*, 2018 WL 4659274, at *3 (N.D. Ill. Sept. 28, 2018).

Since Higgins entered this case as the lead plaintiff, he has understood his role as the class representative and has advocated not only for himself but for the interests of all other class members. (Declaration of Tom Higgins ["Higgins Decl."], ¶ 8, attached hereto as Exhibit 4.) He has assisted Class Counsel in preparing the First Amended Class Action Complaint, subjected himself to discovery, and played a crucial role in securing the Settlement for the class. (*Id.* ¶¶ 3–6.) Given his efforts and aligned interests with the class, there can be no doubt that Higgins has only acted in the best interests of the Settlement Class and has adequately represented them. (*See* dkt. 73 at 4, 6 (finding that Plaintiff Higgins "is an adequate representative of the class" given that he and the Settlement Class "have the same interest in the remedies outlined in the settlement agreement, and there are no antagonistic interests.").)

Likewise, Class Counsel's performance in this case demonstrates that their representation has been beyond adequate. As detailed above, over the past three years, Class Counsel have tirelessly prosecuted TV Guide for its alleged PPPA violations in an effort to recovery monetary and prospective relief for Plaintiff and

the class. This has required Class Counsel to embark on a fact-intensive investigation of TV Guide's practices, engage in robust Rule 12(b)(1) motion practice, conduct extensive jurisdictional, class, and merits discovery, including two depositions of TV Guide's officers, and eventually, engage in meaningful settlement discussions and numerous rounds of arm's-length negotiations. (Scharg Decl. ¶¶ 4–14.) (*See* dkt. 73 at 4, 6–7 (recognizing that Class Counsel "have already done significant work in representing Plaintiff" and "have vigorously litigated the case").)

The considerable amount of class and merits discovery completed in this case ensured that Plaintiff and Class Counsel had adequate information to assess the strength of the case and engage in settlement discussions. Indeed, throughout formal discovery, Class Counsel reviewed thousands of documents from TV Guide related to, *inter alia*, TV Guide's subscription process, its methods of data collection and aggregation, and the nature of its relationships with various third-party companies it disclosed subscriber information to, including Wiland Direct, Epsilon Data Management, and I-Behavior. (Scharg Decl. ¶ 8.) Former plaintiff Hyman also served subpoenas on those third-party companies, who provided more detailed information about the data transmissions at issue, which required expert review. (*Id.* ¶¶ 7–8.) As the case progressed toward settlement, Plaintiff Higgins obtained additional, albeit informal, discovery from TV Guide regarding the size

and composition of the class. (*Id.* ¶ 13.) With these final data points in hand, the Parties and their respective counsel had all the information they needed to fully understand the pertinent issues of the case and reach an informed resolution.

In the end, if the Settlement is approved, the class will reap its valuable benefits thanks to Plaintiff's and Class Counsel's hard work pursuing this case and representing their interests. In light of Plaintiff's and Class Counsel's performance, their diligent investigation into the merits of the case, and the results achieved, it is clear that they have adequately represented the Settlement Class. This factor is well satisfied.

> **B.** **The Settlement Was Negotiated at Arm's Length and Is Free from Fraud and Collusion.**

The second Rule 23(e)(2) factor ensures that the settlement is the "product of arm's-length negotiations as opposed to collusive bargaining." *Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 501-02 (E.D. Mich. 2000); *see also Sheick v. Auto. Component Carrier, LLC,* 2010 WL 3070130, at *13 (E.D. Mich. Aug. 2, 2010) (explaining that arm's-length negotiations conducted "by adversarial parties and experienced counsel" are indicative of a settlement's fairness, reasonableness, and adequacy). The absence of fraud or collusion is presumed unless there is evidence to the contrary. *IUE-CWA*, 238 F.R.D. at 598. *See UAW*, 497 F.3d at 628; *Dick v. Sprint Commc'ns*, 297 F.R.D. at 295 (finding that the exchange of data through litigation and the absence of allegations of fraud or collusion indicated that

the settlement was the result of "good-faith, arm's-length negotiations").

The instant settlement is the product of informed negotiations conducted at arm's length by experienced counsel representing adversarial parties after considerable litigation. (Scharg Decl. ¶ 21.) As detailed in Plaintiff's motion for attorneys' fees, (dkt. 75 at 25), Class Counsel have built their practice upon complex consumer class action litigation, and have significant experience with the PPPA. (Scharg Decl. ¶ 22.) Likewise, defense counsel—attorneys from sophisticated law firms—have significant experience in defending privacy related disputes and have at all times vigorously defended TV Guide throughout this litigation. (*Id.*) As the docket in this case reflects, the parties have vigorously pursued their own interests and positions throughout the litigation, further confirming the absence of fraud or collusion. *See Leonhardt*, 581 F. Supp. 2d at 838; (Scharg Decl. ¶ 23.) And when both sides were finally ready to discuss the possibility of settlement, all of their negotiations occurred only at arm's-length and neither party discussed the issue of attorneys' fees until after the class relief had been negotiated and secured. (Scharg Decl. ¶ 23.) The arm's-length nature of these negotiations is further confirmed by the Settlement itself: it is non-reversionary, provides significant cash payments to the class, and contains no provisions that might suggest fraud or collusion, such as "clear sailing" or "kicker" clauses regarding attorneys' fees. *See Gascho*, 822 F.3d at 277.

For these reasons, there should be no question that the Settlement here was the result of good-faith, arm's-length negotiations and is entirely free from fraud or collusion. This factor thus supports granting final approval.

### C.   The Settlement Treats All Settlement Class Members Equally.

The next factor under Rule 23(e)(2) considers whether the proposed settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). This inquiry ensures that the Settlement does not "give[] preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 755 (6th Cir. 2013) (citation omitted). Notably, fair treatment among class members is "assured by straightforward pro rata distribution of the limited fund." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999).

Here, the proposed Settlement treats all Settlement Class Members equally: each is entitled to identical prospective relief and a single, *pro rata* cash payment from the Settlement Fund, estimated to be $60–80. (Agreement ¶ 2.1–2.2; Scharg Decl. ¶ 17.) Given that each Settlement Class Member has identical PPPA claims for the same amount of statutory damages, *pro rata* distribution of the non-reversionary common fund is certainly the most equitable distribution method possible in this case.

The equitable treatment under the Settlement is not altered by the fact that the Settlement permits the Court to award Plaintiff a modest $5,000 case contribution award to compensate him for the service he provided to ensure the class he represented obtained meaningful relief. (*See* dkt. 75; Higgins Decl. ¶¶ 3– 9.) As explained in detail in Higgins' request for a service award, here, an incentive award of $5,000 is not a bounty or a windfall, and is in fact reasonable to compensate him for the time and effort he expended in obtaining a $1.7 million common fund settlement for the class. (Dkt. 75 at 28–30 (discussing *In re Pampers Dry Max Litig.*, 724 F.3d 713 (6th Cir. 2013) and Plaintiff's crucial service in the case).) Modest service awards—like the one sought here—are regularly approved in this District and do not create either an adequacy issue nor indicate unfair preferential treatment when, as here, the award provides compensation for time that is spent on a case that secures meaningful relief for the class. (*See* dkt. 75.)

Simply put, all Settlement Class Members are being treated equally under the Settlement, and Plaintiff's request for a reasonable incentive award to compensate him for his efforts in securing the Settlement does not change that fact. This factor therefore also weighs in favor of final approval.

### D. The Relief Secured for the Settlement Class is Adequate and Warrants Final Approval.

The final and most substantive factor under Rule 23(e)(2) examines whether the relief provided for the class is adequate. Fed. R. Civ. P. 23(e)(2)(C). In making

this determination, Rule 23 instructs courts to take into account several sub-factors, including (i) the cost, risks, and delay of trial and appeal; (ii) the effectiveness of the proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreements made in connection with the proposed settlement. *Id.* As explained below, each of these sub-factors demonstrate that the Settlement provides adequate relief to the class and should be approved.

### 1. The Cost, Risk, and Delay of Further Litigation Compared to the Settlement's Benefits Favors Final Approval.

In evaluating the adequacy of the relief provided to the class, courts should first compare the cost, risks, and delay of pursing a litigated outcome to the settlement's immediate benefits. Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. Where the settlement class has only been certified for settlement purposes, as here, courts should also consider the likelihood of certifying the class for litigation. *Id.* "Although this inquiry understandably does not require [the court] to decide the merits of the case or resolve unsettled legal questions," the fairness of a proposed settlement cannot be judged "without weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *UAW*, 497 F.3d at 631 (citation omitted). Ultimately, the question is whether the class's interests "are better served

if the litigation is resolved by the settlement." *Leonhardt*, 581 F. Supp. 2d at 836.

Final approval is favored in cases such as this one, where the parties are "likely

[to] expend significant time and money litigating [a] case through class

certification, dispositive motions, trial, and appeal," further chipping away at the

amount—and possibility—of class recovery. *Stinson v. Delta Mgmt. Assocs., Inc.*,

302 F.R.D. 160, 164 (S.D. Ohio 2014); *see In re Telectronics Pacing Sys., Inc.*,

137 F. Supp. 2d 985, 1013 (S.D. Ohio 2001).

Undoubtedly, further litigation in this case would produce substantially more

motion practice, including an adversarial motion for class certification, motions for

summary judgment, and inevitable appeals. This is especially true given that the

only PPPA case in this District to be fully litigated required complex and time-

consuming briefing on class certification, for summary judgment, and appeal

(which affirmed a grant of summary judgment to the defendant). *See Coulter-*

*Owens v. Time, Inc.*, 308 F.R.D. 524 (E.D. Mich. 2015) (granting class

certification); *Coulter-Owens v. Time, Inc.*, 2016 WL 612690 (E.D. Mich. Feb. 16,

2016) (granting defendant's cross motion for summary judgment and dismissing

plaintiff's and the class's PPPA claims); *Coulter-Owens v. Time, Inc.*, Nos. 16-

1321 & 16-1380, 695 F. App'x 117 (6th Cir. 2017) (affirming the district court's

summary judgment ruling).

While Higgins believed his chances of succeeding in certifying an adversarial class and prevailing on summary judgment or at trial were strong, he recognized they were also far from certain. (*See* Scharg Decl. ¶ 18.) Defendant's main case-dispositive argument—lack of Article III standing due to *Spokeo* and the retroactive application of the amended PPPA—had already been defeated at the motion to dismiss stage, and the uniformity of TV Guide's conduct toward the class made the case amenable to certification. *See Coulter-Owens v. Time, Inc.*, 308 F.R.D. 524 (certifying class where defendant engaged in similar conduct toward its magazine subscribers).

That said, there remained several ways in which the class could wind up empty-handed. Absent final approval of the Settlement, TV Guide would surely move for summary judgment, asserting any one (or more) of its numerous affirmative defenses on the merits. (*See* dkt. 43 (asserting 18 affirmative defenses).) For example, TV Guide would likely continue to claim that the PPPA (i) does not prohibit the disclosure of the magazine subscription information at issue, because the recipients of the disclosures are its agents or the disclosures were permissible under the PPPA's "direct marketing exception," and (ii) does not apply to TV Guide at all because TV Guide is not engaged in the business of selling magazines "at retail," as is required under the scope of the Statute. (Scharg

25

Decl. ¶ 19.) TV Guide has also made clear that it would continue to challenge the constitutionality of the PPPA. (*Id.*)

And, absent a summary judgment victory here, such a hard-fought case would ultimately lead to the first ever trial of PPPA claims, which would certainly prove costly and guarantee that the matter would not conclude any time in the near future. (*Id.* ¶ 20.) Moreover, Plaintiff recognizes that TV Guide would appeal the merits of any adverse decision at summary judgement or trial. (*Id.*) And, due to the massive aggregated statutory damages in play, TV Guide would be sure to argue— both at trial and on appeal—for a reduction of damages based on due process concerns, making the possibility of a full recovery, or anything close to it, unlikely. (*Id.*); *see Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003) ("[T]he potential for a devastatingly large damages award, out of all reasonable proportion to the actual harm suffered by members of the plaintiff class, may raise due process issues."). Ultimately, failure at any one of these points could strip the class of all recovery, making further litigation "a high stakes 'zero sum' undertaking." *Leonhardt*, 581 F. Supp. 2d at 833.

Against this backdrop of risk and uncertainty, the benefits of the Settlement are unmistakable. In terms of monetary relief, the Settlement's $1.7 million non-reversionary Settlement Fund will be used to pay Settlement Class Members *pro rata* cash payments which are estimated to be $60–80 per claimant. (Scharg Decl. ¶

17.) These significant cash payments are in line with—and in many cases exceed—the payments class members have received in previous PPPA settlements approved in this District. *See, e.g., Rodale*, No. 14-cv-12688, dkt. 54 (securing a $4.5 million fund for a class of approximately 580,000 magazine subscribers under PPPA with claiming class members receiving a *pro rata* payment of approximately $44); *Perlin*, No. 16-cv-10635, dkt. 55 (securing a $7.4 million fund for a class of approximately 600,000 magazine subscribers under PPPA with claiming class members receiving a *pro rata* payment of approximately $50); *Kinder*, No. 13-cv-11284, dkt. 81 (securing a $7.5 million fund for a class of approximately 980,000 magazine subscribers under PPPA with claiming class members receiving a *pro rata* payment of approximately $50); *Halaburda*, No. 12-cv-12831, dkt. 68 (securing a $775,000 fund for a class of 40,000 magazine subscribers under PPPA with claiming class members receiving a *pro rata* payment of approximately $74); *Moeller*, No. 5:16-cv-11367, dkt. 42 (securing a $7.6 million fund for a class of 415,000 magazine subscribers under PPPA with claiming class members receiving an estimated $100).

The reasonableness of the anticipated $60–80 *pro rata* payments becomes all the more apparent when looking at the relief afforded in the typical privacy settlement, where classes tend to be enormous, but individual class members receive only *cy pres* relief without any individual payments. *See, e.g., Lane*, 696

F.3d at 820-22 (affirming $9.5 million settlement providing *cy pres* payment as sole monetary relief in case where statutory damages of up to $10,000 per claim were available in class of millions); *In re Google Buzz Privacy Litig.*, 2011 WL 7460099, at *3-5 (approving $8.5 million settlement providing *cy pres* payment as sole monetary relief in case where statutory damages of up to $10,000 per claim were available in a class of millions); *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6-7 (approving $9 million settlement providing *cy pres* payment as sole monetary relief in case where statutory damages of $2,500 per claim were available to class of millions).

And, often overshadowed, but just as important, the Settlement delivers meaningful prospective relief. For the next four years, Defendant will not disclose its Michigan customers' subscriber information to third parties without prior express written consent. (Agreement ¶ 2.2(a).) This relief aligns perfectly with both the goals of the PPPA and those of this lawsuit. *See, e.g.*, *Halaburda*, dkt. 69, at 19 (E.D. Mich. Jan. 5, 2015) (finally approving a class action in similar PPPA litigation and finding that "the more important provisions of the settlement agreement are the provisions according equitable relief and a cessation of the disclosure altogether for this period of four years by the defendants").

Where, as in this case, the cost, risk, and delay of further litigation will threaten a positive outcome for the class, the benefits of the Settlement—both

prospective and monetary—are readily apparent. This sub-factor thus supports final approval.

### 2. *The Method of Distributing Relief to the Settlement Class Members Is Effective and Supports Final Approval.*

The next sub-factor evaluates whether the settlement's proposed methods of distributing relief to the class and processing class member claims is effective. Fed. R. Civ. P. 23(e)(2)(C)(ii). An effective claims process "strikes a proper balance between, on the one hand, avoiding fraudulent claims and keeping administrative costs low, and on the other hand, allowing as many class members as possible to claim benefits." *See In re: Whirlpool Corp. Front–loading Washer Prod. Liab. Litig.*, 2016 WL 5338012, at *14 (N.D. Ohio Sept. 23, 2016) (internal citation omitted); Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment ("A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding."). Rule 23(e) also suggests that the parties provide the court with the anticipated claims rate and the manner in which any unclaimed settlement funds will be distributed. *Id.*

Here, there can be no doubt that the claims system under the Settlement is the most effective and feasible method of processing class member claims and distributing monetary relief to them. To recap, the Settlement provides a *pro rata* cash payment to any Settlement Class Member who files a timely and valid Claim

Form, either via postcard or online, by the Claims Deadline. (Agreement ¶ 2.1.)
Paper copies of the simple Claim Form were attached to each direct mail notice
with return postage prepaid, which as detailed above reached approximately 90%
of the Settlement Class, and can also be downloaded on the Settlement Website or
requested from Heffler by mail or telephone. (*See* Agreement, Exs. C, D.)
Settlement Class Members can also submit electronic copies of the Claim Form
through the currently active Settlement Website at www.tvguidesettlement.com.
(*Id.*) Of the 14,386 Claim Forms submitted to date, 13,459 were submitted by U.S.
Mail and 927 were submitted online. (Mahan Decl. ¶ 16.)

All submitted claims have been and will continue to be processed and
thoroughly vetted by Heffler. (Agreement ¶ 5.2; Mahan Decl. ¶ 16.) Heffler has
significant experience in auditing claims in class action settlements and has
reviewed all submitted claims in this case with the appropriate rigor. (Mahan Decl.
¶¶ 2, 16.) Additionally, Heffler has designed the Settlement Website to prevent the
filing of fraudulent claims online by requiring online claimants to provide their
unique "Class Member ID" stated on their postcard notice to verify class
membership. (*Id.* ¶ 16.)

On the other hand, Heffler will also take measures to ensure as many
Settlement Class Members as possible participate in the Settlement. For example,
any class member whose claim is initially rejected by Heffler will receive a

deficiency notice, which will identify all deficiencies on their Claim Form in easily understandable language and allow claimants to cure any such deficiencies with ease. (Agreement ¶ 5.2; Mahan Decl. ¶ 17.) At bottom, the claims process here thoughtfully balances the core concerns of deterring unjustified claims and providing relief to as many Settlement Class Members as possible. *See* Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment.

Based on the current participation rate of approximately 15%, and accounting for the possibility of fraudulent claims, Class Counsel estimates— consistent with their estimate at preliminary approval, (dkt. 72 at 2)—that the final claims rate will range between 12–17%, which is typical in PPPA class action settlements and is on the high end of consumer class action claims rates in general. *See Perlin*, No. 16-cv-10635, dkt. 55 (achieving claims rate of over 14% in PPPA case); *Gascho*, 822 F.3d at 290 (crediting expert testimony "that response rates in class actions generally range from 1 to 12 percent, with a median response rate of 5 to 8 percent[.]"). Thus, if the Settlement is approved, each Settlement Class Member who submitted an Approved Claim can expect to receive a check from Heffler, delivered via First Class U.S. Mail, for about $60–80 within 60 days after the Effective Date. (Agreement ¶ 2.1.) Any checks not cashed within 90 days of issuance will, subject to Court approval, revert to the Michigan Bar Foundation's Access to Justice Fund. (*Id.*)

Put succinctly, the claims administration process here ensures that only legitimate claimants will receive payment, encourages participation in the Settlement, and distributes meaningful relief to the Settlement Class Members. Accordingly, this sub-factor supports final approval.

### 3.      *The Terms of the Requested Attorneys' Fees Are Reasonable.*

The third sub-factor considers the adequacy of the relief provided to the class taking into account "the terms of the requested attorneys' fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). As explained at length in Plaintiff's Motion for Attorneys' Fees, Expenses, and Incentive Award, both the proposed method of calculating attorneys' fees and the requested percentage fee award are reasonable and predicated on the outstanding relief provided to the Settlement Class. (Dkt. 75.) Specifically, Class Counsel requests a fee award of 35% of the $1.7 million non-reversionary Settlement Fund, which is consistent with percentage awards in previous PPPA cases in this District. *See, e.g.*, *Perlin*, No. 16-cv-10635, dkt. 55 (awarding 40% of $7.4 million common fund); *Kinder*, No. 13-cv-11284, dkt. 81 (awarding 35% of $7.5 million common fund); *Moeller*, No. 5:16-cv-11367, dkt. 42 (awarding 35% of $7.6 million common fund).

If approved, the Settlement provides that attorneys' fees will be paid within five business days after entry of the final approval order. (Agreement ¶ 8.2.) As the Sixth Circuit has recognized, in common fund cases such as this, the prompt

payment of attorneys' fees is reasonable and "does not harm the class members in any discernible way, as the size of the settlement fund available to the class will be the same regardless of when the attorneys get paid." *Pelzer v. Vassalle*, 655 F. App'x 352, 365 (6th Cir. 2016); *see id.* ("Quick-pay provisions are common."); *In re LivingSocial Mktg. & Sales Practice Litig.*, 298 F.R.D. 1, 22 n.25 (D.D.C. 2013) ("There is ample authority for the 'quick pay' provision.") (collecting cases); *see also In re: Whirlpool Corp. Front–loading Washer Prod. Liab. Litig.*, 2016 WL 5338012, at *21 (explaining that the quick-pay clause in no way "serv[ed] as proof that [c]lass [c]ounsel in this case somehow pursued their own interests at the expense of the class").

Since the terms of the requested attorneys' fees are reasonable and in no way affect the relief provided to the class, this third sub-factor also favors final approval.

### 4. There Are No Agreements Outside the Settlement To Be Identified.

Finally, Rule 23(e) requires the parties seeking approval to identify any agreement made in connection with the proposed Settlement. Fed. R. Civ. P. 23(e)(2)(C)(iv). Here, apart from the terms laid out in Section 8 of the Settlement Agreement—which relate to payment and timing of attorneys' fees, as discussed above *supra* Section V.D.4—there are no agreements made in connection with the proposed Settlement. (Scharg Decl. ¶ 24.) The Court can therefore rest assured that

33

the written Settlement Agreement provided to the Court here and at preliminary approval represents the entirety of the Parties' proposed Settlement. (*Id.*)

Accordingly, because each factor and sub-factor identified in Rule 23(e)(2) is satisfied, the Court should confirm that the Settlement is fair, reasonable and adequate, and grant final approval.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order (i) granting final approval to the Settlement Agreement, and (ii) awarding such other and further relief as the Court deems reasonable and just.

Respectfully submitted,

Dated: December 5, 2018

**TOM HIGGINS**, individually and on behalf of the settlement class

By: /s/ Ari J. Scharg
One of Plaintiff's attorneys

Ari J. Scharg
ascharg@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
Schuyler R. Ufkes
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Eve-Lynn J. Rapp
erapp@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Henry M. Scharg
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: (248) 596.1111
Fax: (248) 671.0335

*Settlement Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

    I, Ari J. Scharg, an attorney, hereby certify that on December 5, 2018, I served the above and foregoing ***Plaintiff's Motion for and Brief in Support of Final Approval of Class Action Settlement*** on all counsel of record by filing it electronically with the Clerk of the Court using the CM/ECF filing system.

                        /s/ Ari J. Scharg